1              IN THE UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF TEXAS

3                      HOUSTON DIVISION

4    USA                          §    CASE NO. 4:24-CR-543
                                  §    HOUSTON, TX
5    VERSUS                       §    THURSDAY,
                                  §    OCTOBER 31, 2024
6    DARVI HINOJOSA AND           §    9:01 AM to 11:04 AM
     JOHN SBLENDORIO              §
7
                      INITIAL APPEARANCE
8
                BEFORE THE HONORABLE YVONNE Y. HO
9                 UNITED STATES MAGISTRATE JUDGE

10                        APPEARANCES:

11
          FOR THE PARTIES:           SEE NEXT PAGE
12
          ELECTRONIC RECORDING OFFICER: CHRISTOPHER RODRIGUEZ
13
          COURT CLERK:               RACHEL WILLBORG
14

15

16

17

18

19

20

21                TRANSCRIPTION SERVICE BY:

22              Veritext Legal Solutions
                330 Old Country Road, Suite 300
23                   Mineola, NY 11501
              Tel: 800-727-6396 ▼ www.veritext.com
24

     Proceedings recorded by electronic sound recording; transcript
25                produced by transcription service.

1                              APPEARANCES:

2   FOR THE PLAINTIFF:              U.S. DEPARTMENT OF JUSTICE
                                    Byron Hugh Black
3                                   1000 Louisiana Street, Suite 2300
                                    Houston, TX 77002
4                                   713-567-9432

5   FOR THE DEFENDANT              J. RAYNOR CARR & ASSOC., P.C.
    DARVI HINOJOSA:                Joyce A. Raynor
6                                   9894 Bissonnet, Suite 320
                                    Houston, TX 77026
7                                   713-988-5533

8   FOR THE DEFENDANT              LAW OFFICE OF ANTHONY
    JOHN SBLENDORIO:               TROIANI, P.C.
9                                   Anthony P. Troiani
                                    5020 Montrose Boulevard
10                                  Suite 700
                                    Houston, TX 77006
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          HOUSTON, TEXAS; THURSDAY, OCTOBER 31, 2024; 9:01 AM

2               CLERK:  The United States District Court for the

3     Southern District of Texas is now in session, (indiscernible).

4               THE COURT:  Good morning, everyone.  Please be

5     seated.

6               Calling Case Number 4:24-CR-543, United States v.

7     Darvi Hinojosa and John Sblendorio.

8               Let me take appearances.  First for the United

9     States.

10              MR. BLACK:  Good morning, Your Honor.  Byron Black

11    for the Government.

12              THE COURT:  Good morning, Mr. Black.

13              And for Mr. Hinojosa?

14              MS. RAYNOR:  Good morning.  Attorney Joyce Raynor

15    (indiscernible).

16              THE COURT:  Good morning, Ms. Raynor.

17              And for Mr. Sblendorio?

18              MR. TROIANI:  Good morning, Your Honor.  Anthony

19    Troiano on behalf of Mr. Sblendorio.

20              THE COURT:  Good morning, Mr. Troiano.  All right.

21    We have on the schedule detention hearing for Mr. Hinojosa and

22    Sblendorio.  Are the parties ready to proceed?

23              MR. BLACK:  Yes, Your Honor.

24              MS. RAYNOR:  Yes, Your Honor.

25              MR. TROIANI:  Yes, Your Honor.

1        THE COURT:  All right.  Then let's get started.

2        Mr. Black, you may call your first witness.

3        MR. BLACK:  Your Honor, the Government calls FBI Task

4   Force Officer Joshua Lyons.

5        CLERK:  Do you swear that the testimony you are about

6   to give will be the truth, the whole truth, and nothing but the

7   truth, so help you God?

8        MR. LYONS:  Yes, ma'am, I do.

9        THE COURT:  All right.  You may begin.

10       MR. BLACK:  Thank you, Your Honor.

11              DIRECT EXAMINATION OF JOSHUA LYONS

12   BY MR. BLACK:

13   Q    TFO Lyons, could you please just state and spell your name

14   for the record?

15   A    Joshua Lyons.  J-o-s-h-u-a, L-y-o-n-s.

16   Q    And I understand you are currently a Task Force Officer

17   with the Federal Bureau of Investigation; is that right?

18   A    Yes, sir.

19   Q    Can you tell us very briefly about your career in law

20   enforcement?

21   A    I'm a sworn Texas Peace Officer beginning in 2007 with the

22   Texas Board of Criminal Justice's Office of the Inspector

23   General.  I've been a task force officer with the FBI Safe

24   Streets Task Force here in Houston since approximately 2010.

25   So going on now 14 years.

1    Q    And during that time both with the Safe Streets Task

2    Force, but also in your previous law enforcement career, have

3    you had occasion to investigate motorcycle gangs and clubs here

4    in the State of Texas and elsewhere?

5    A    Yes, sir.

6    Q    And in doing so, have you become familiar with motorcycle

7    clubs?

8    A    Yes, sir.

9    Q    Specifically are you familiar with the Bandidos motorcycle

10   gang?

11   A    Yes.

12   Q    And how did you become familiar with the Bandidos?

13   A    We began an investigation into the Bandidos outlaw

14   motorcycle gang around the 2019 timeframe.

15   Q    And during that investigation did you have occasion to

16   interview various members, current and former, of the Bandidos?

17   A    Yes, sir.  Several.

18   Q    And in doing so did you learn about practices, structure,

19   and organization?

20   A    Yes, sir.

21   Q    So let's just start with kind of talking about what the

22   Bandidos are generally.  We're not going to dwell on this a

23   bunch, but it's kind of table setting that we need to do for

24   everything else to make sense.

25        So what are the Bandidos?

1   A    The Bandidos are an outlaw motorcycle gang as defined here

2   in Texas known to apply the one percent diamond paramilitary

3   and rank structure, have a set of bylaws, created and

4   predominantly here in Texas, though they are in several states

5   and, frankly, worldwide.

6   Q    Now, you mentioned the one percent diamond.  What is that

7   and what is the significance?

8   A    As defined by the American Motorcycle Association, I'll

9   paraphrase, 99 percent of those who ride motorcycles are law-

10  abiding citizens.  There is a one percent that are very proud

11  to be unconventional in terms of considering themselves

12  rulebreakers or lawbreakers who don't follow the norm.

13  Q    So the Bandidos Motorcycle Gang is considered a one

14  percent in that it doesn't comply with social rules and norms?

15  A    Yes, sir.

16  Q    And does that include criminal behavior?

17  A    Yes, sir.

18  Q    So the Bandidos -- based upon your experience and

19  investigation of the Bandidos, what sort of criminal activity

20  does the enterprise engage in?

21  A    From our investigations, they have engaged in narcotics

22  trafficking, firearms trafficking, robbery, assault, murder,

23  witness tampering.

24  Q    So let's talk about how one becomes a member of the

25  Bandidos.  How do you become a Bandido?

1  A    There are I guess two paths.  You can join and be a member
2  of an official Bandidos support club which then you kind of put
3  in your work or notice and then asked to prospect into the
4  Bandidos and go through a -- or potentially a hang around
5  prospect phase of various times.  Then, you know, after you do
6  what you need to do, then you are made a full patch member.
7  There are some that aren't members of support clubs and they
8  then go straight to the hang around phase with a timeline, then
9  a prospect phase for six months.  And then if they comply with
10  what they need to do for the club, then they're made a member.
11  Q    Okay.  So there are kind of three steps to the process if
12  I'm understanding right.  Hang around, prospect, and then you
13  become a member?
14  A    Yes, sir.  There are some that based off their reputation
15  maybe don't have to hang around per se and go through that
16  status and are just invited in as a prospect.
17  Q    Now, you mentioned support clubs as being distinct from
18  the Bandidos itself.
19  A    Yes.
20  Q    But what are support clubs?
21  A    The Bandidos, in order to -- as part of I guess the red
22  and gold nation, or however they want to be known as red and
23  gold, they have Bandidos, but then they have support clubs,
24  which they sanction and get permission to form.  And their
25  colors are the same color scheme except swapped in terms of the

1  lettering on the color.  But they wear an official patch, what

2  they call a cookie or coaster that says that they support the

3  Bandidos.  And they do that to increase their numbers.

4  Q    And they do that to increase their numbers.  They...

5  A    The Bandidos.

6  Q    The Bandidos.

7  A    Yes.

8  Q    Okay.  You mentioned color scheme associated with the

9  Bandidos.  Are there specific colors, signs and insignia that

10 are associated with the club?

11 A    Red and Gold.  And they have an official mascot that's

12 referred to as the Fat Mexican.

13 Q    Okay.  And is that what -- we'll see some pictures of at

14 some point here, but can you just describe it for the record?

15 A    It's a Hispanic male that's wearing a sombrero, pointing a

16 firearm at like a profile view.

17 Q    All right.  Now we talked about support clubs.  Kind of

18 related to this, I want to ask -- so I am living in the Houston

19 area here.  If I wanted to start a motorcycle club of some

20 sort, could I just haul off and do that?

21 A    You could, but you probably wouldn't last very long.

22 Q    And not just personally because of who I am, but --

23 A    Yes.

24 Q    -- just because I understand there are reasons

25 structurally.

1  A    Yes, sir.

2  Q    Could you explain those?

3  A    There are two ways -- there's one that you just go

4  straight to the Bandidos and let them know that you'd like to

5  form a motorcycle club.  And then if they know you or they give

6  you certain rules, maybe probation in order to earn the right

7  to wear red and gold and get the support cookie, basically get

8  permission and sponsored by them to do so.

9      Some clubs go to what they call the COC or the

10 Confederation of Clubs, try to do it the legitimate way that

11 they are then given sanctions.  The issue is that The Bandidos

12 have traditionally controlled the COC.  So it might seem like

13 the legitimate way to go, but ultimately it will come back to

14 the Bandidos that control who can survive as a motorcycle club.

15 Q    So what happens if in Houston here I start a club go to

16 the Bandidos and I don't go to the COC?

17 A    You're probably going to get confronted and then told to

18 shut down.

19 Q    And if I don't shut down?

20 A    Usually told and then physical violence.

21 Q    Understood.  Are there ranks or positions within the

22 Bandidos?

23 A    Yes, sir.

24 Q    What are those?

25 A    They are paramilitary and ranking structures.  So for the

1  individual chapter, again, you have your hang around, which is
2  not really a rank; it's a status.  And then prospect, which is
3  kind of a status.  And then once you become a full member,
4  you're like just a regular soldier so to speak.  They have
5  ranks such as the sergeant at arms, secretary treasurer, or
6  secretary or treasurer.  Sometimes the chapter will combine the
7  ranks, sometimes they are separate.  Some chapters will have a
8  road captain, vice president, and president of that chapter.
9      And then they have a national -- a unit so to speak that
10  has its own ranking system.
11  Q    Understood.  So just a few questions.  I just want to talk
12  about two of those positions since they're relevant to what
13  we're going to discuss later today.  Can you tell us both about
14  the sergeant at arms position and then the secretary or
15  treasurer position?
16  Q    The sergeant at arms of the chapter is basically like the
17  primary enforcer for that chapter.  He is in charge of
18  enforcing the rules, the Bandido rules, of also kind of
19  protecting the integrity of that club, of that chapter in terms
20  of making sure everyone is in line, which means then he is also
21  responsible for handing out disciplines among that chapter,
22  which could be verbal all the way to physical discipline of its
23  chapter members.  He also is responsible for the safety and
24  security of the chapter president.
25      The secretary or secretary treasurer is really like an

1    administrative person inside that chapter.  Keeps rosters,
2    phone rosters, in charge of the money and the mandatory dues
3    that come in and who pays, who is late, and also in terms of
4    the mandatory runs, card games and meetings.  So putting out
5    announcements.  Just running the day-to-day administration of
6    that chapter.
7    Q    You mentioned that there are dues.  Can you tell us a
8    little bit about the dues?
9    A    Each chapter and per the Bandidos have to pay mandatory
10   dues each month to their chapter, which then is collected and
11   it's sent off to the national chapter or kept to use for
12   chapter business.
13   Q    Okay.  For context here, just to kind of put this all in
14   its place, so you mentioned chapters a lot.  How does that fit
15   into the overall structure of this organization?
16   A    So the organization just forms chapters in its geographic
17   region.  So for example the Bandidos from Texas, you're a
18   Bandido in Texas.  On your butt you have a Texas bottom rocker.
19   If you were in New Mexico, you'd have New Mexico or Oklahoma,
20   et cetera.
21   Q    And a bottom rocker is like a patch at the bottom of
22   your...
23   A    Yes, sir.  It's a patch.  And if we see pictures of cuts,
24   I'd be happy to point them out.  And it just says what state
25   you operate in.  And then in that state, each geographical

1    region will have a chapter.  For example, here in Houston there
2    are several depending on what geographical location.  For
3    example, Galveston (indiscernible) up in Montgomery County,
4    Southwest Houston, Northeast Houston, (indiscernible).  And
5    just wherever you happen to be, that chapter will let everybody
6    know where you're centrally located.
7    Q    And you said these chapters, they have their own positions
8    such as president, vice president, sergeant at arms, and so on?
9    A    Yes, sir.  Yes, sir.
10   Q    So one last bit of context we need to talk about here, and
11   that is the Bandidos and their rivals here specifically in the
12   region.  Do Bandidos have any motorcycle gang rivals?
13   A    Yes, sir.  So...
14   Q    Okay.  And we're going to concentrate on just one of them
15   today, because I know we could talk about that for a long time.
16   But we're going to talk about one called Brothers East.
17   A    Yes, sir.
18   Q    Are you familiar with them?
19   A    Yes, sir.
20   Q    And they go also by kind of a shortened moniker BEAST.  Is
21   that right?
22   A    Yes.
23   Q    Okay.  Tell us about BEAST.
24   A    BEAST was formed in 2015 by some individuals who, as we
25   discussed, did it the way they were supposed to.  And they went

1   to the Bandidos and asked for permission to form their club,

2   the motorcycle club, that was basically then sponsored by the

3   Bandidos.

4        After some time for various reasons, the BEAST broke off

5   and in other words declared independence and then started

6   flying the Texas bottom rocker and the one percent diamond,

7   which the Bandidos took issue with.  And then they went to war.

8   Q    And what is the current state of relations between BEAST

9   and the Bandidos?

10  A    It's considered to be warfare.  Turf dominance.

11  Q    And what does warfare mean in this context?

12  A    Usually like a smash on site type of thing which is, you

13  know, an acronym that a lot of gangs use called an SOS where

14  you're expected to assault in any form or capacity when you see

15  a rival to declare dominance of wherever you happen to be.

16  Q    All right.  So now we're going to turn to the individuals

17  that are in court today and talk more specifically about them.

18       We're going to start with Mr. Darvi Hinojosa, although

19  there is going to be some overlap.  So are you familiar with

20  Mr. Darvi Hinojosa?

21  A    Yes, sir.

22  Q    Okay.  And do you see him here in the courtroom today?

23  A    I do.

24  Q    Okay.  Could you just point and describe what he's

25  wearing?

1    A    It's this gentleman directly in front of me wearing a

2    green jumpsuit.

3            MR. BLACK:  Let the record reflect the identification

4    of Defendant Number One.

5            THE COURT:  So indicated.

6    BY MR. BLACK:

7    Q    So what can you tell us about what you learned about Mr.

8    Hinojosa generally?

9    A    He came into notice of our investigation around October of

10   2021 timeframe when we became aware of the new chapter that

11   formed in the Houston area called the Welcome to Hell chapter.

12   Q    And what did you learn about Mr. Hinojosa's connection

13   with the Bandidos and that chapter?

14   A    That he was a probationary member of the Welcome to Hell

15   chapter.

16   Q    At that time?

17   A    Yes, sir.  In the October 2021 timeframe.

18   Q    Okay.  That was my next question.  About how long have has

19   he been associated or a member of Bandidos?

20   A    From our investigation, he was never part of a support

21   club or -- you know, he kind of did a hang around status and

22   then was made a probationary member after some time.

23   Q    So directly a probationary member of the Bandidos?

24   A    Yes, sir.  Yes.  Which -- and which is also allowed for

25   some that are either known by the Bandidos or have some history

1    in motorcycles that you can become a probationary member and

2    kind of not a prospect.

3    Q    Does he have an alias or a nickname that you've uncovered

4    during your investigation?

5    A    Yes, sir.

6    Q    What is that?

7    A    Many times people just refer to him as Darvi.  And then he

8    started using the alias of Ten Round.

9    Q    Ten, the number ten and then round?

10   A    Yes, sir.

11   Q    Is Mr. Hinojosa, is he still a probationary member of the

12   Banditos?

13   A    No, sir.

14   Q    What is his current status in the Bandidos?

15   A    He was a sergeant at arms of the Welcome to Hell chapter.

16   Q    Okay.  And that's the position you previously described to

17   us?

18   A    Yes, sir.

19   Q    What can you tell us kind of generally about the Welcome

20   to Hell chapter?

21   A    The Welcome to Hell chapter was formed around sometime in

22   late 2021, a little bit before October '21, maybe around

23   September.  And it was formed to give almost as a reward to its

24   chapter president by the name of John Pfeffer, who goes by Big

25   John.  And it was formed for a specific reason of targeting

1 rivals, thus the name Welcome to Hell, which is not common as

2 typically a chapter will be called by a city or geographic

3 location.  But Welcome to Hell, pretty self-explanatory.

4 Q    I'm going to show you an exhibit here.

5         MR. BLACK:  Your Honor, may I approach the witness?

6         THE COURT:  Yes, you may.

7 BY MR. BLACK:

8 Q    So, TFO, I am showing you now what's been marked for

9 identification as Government's Exhibit 1.  Do you recognize

10 that?

11 A    Yes, sir.

12 Q    How do you recognize it?

13 A    That's a photo of Darvi Hinojosa in his Bandidos cut and

14 wearing an Expect No Mercy medallion.

15 Q    And you recognize that because you're familiar with Mr.

16 Hinojosa?

17 A    Yes, sir.

18 Q    And you've seen him in this paraphernalia before?

19 A    Yes, sir.

20         MR. BLACK:  Your Honor, Government moves to admit

21 Government Exhibit 1.

22         MR. TROIANI:  No objection.

23         MS. RAYNOR:  No objection.

24         THE COURT:  So the Cout will admit Government's

25 Exhibit 1 for purposes of today's hearing.

1          (Government's Exhibit 1 entered into evidence)

2          MR. BLACK:  And then with the Court's permission just

3    to aid along here, I have a better copy in front of the witness

4    of the exhibits.

5          THE COURT:  That's fine.

6    BY MR. BLACK:

7    Q    So, TFO, can you just kind of walk us through generally

8    what we're seeing in Exhibit 1 here?  I think we're seeing some

9    patches that you talked about before.

10   A    Yes, sir.  He has his sergeant at arms rank tag, which is

11   common, to let everybody know what his rank is.  And then he

12   has an Expect No Mercy patch above that and an Expect No Mercy

13   medallion that he's wearing.

14   Q    So I don't know that we've talked about the Expect No

15   Mercy patch.  Are you familiar with that patch?

16   A    Yes, sir.

17   Q    What can you tell us about it?

18   A    The Expect No Mercy patch was created and it's not a patch

19   that every Bandido can wear; you have to earn it.  It has to be

20   rewarded to you.  And it's by committing a significant act of

21   violence in furtherance of the Bandidos' racketeering

22   enterprise.

23   Q    And can anyone give you that Expect No Mercy patch?

24   A    No, sir.  It has to be given by -- usually here recently

25   just two individuals.

1    Q    And what are those, the status of those individuals?

2    A    Basically long-term Bandidos that have earned it and are

3    thus known as the ones that can hand it out.

4    Q    So we're going to move on specifically to an incident on

5    November 2, 2021 that I'm aware of that you became familiar

6    with.  That is going to set the stage here an incident that

7    occurs around the Blue Bayou Café here in Houston, Texas.  Do

8    you know what I'm talking about?

9    A    Yes, sir.

10   Q    Okay.  So can you kind of walk us through what's relevant

11   that happened on that date at Blue Bayou?

12   A    On November 2nd, 2021, BEAST, the Bandidos' rival, had

13   held a meeting, a different type of bike event at their

14   clubhouse in Channelview.  When that meeting was concluded,

15   several members decided to go eat at the Blue Bayou Café bar on

16   Interstate 10 to the west in Houston.  Some BEAST members drove

17   their vehicles, some went on their motorcycles.

18        When they left, when the BEAST members left the Blue Bayou

19   Café, the members in the vehicles left.  Three BEAST members on

20   motorcycles briefly stayed behind, smoke cigarettes and talked

21   a little bit.  And then as soon as they pulled out, a dark SUV

22   pulled up alongside of them and opened fire with the firearm.

23   Q    And what was the result of that shooting?

24   A    Two BEAST members were shot and wounded and one was shot

25   and killed.

1  Q    And was that investigated by law enforcement?

2  A    Yes, sir.

3  Q    And were the victims, the shooting victims, were they

4  interviewed?

5  A    Yes, sir.

6  Q    What if anything did they say about what they observed

7  leading up to the shooting?

8  A    Just a dark SUV was the -- again, one of the victims was

9  deceased and died before or was dead upon arrival of law

10 enforcement.  Saw a dark SUV.  One of the victims was able to

11 identify the shooter.

12 Q    Okay.  And before we get to identifying the shooter, does

13 witnesses describe whether there was just one person in this

14 vehicle or more?

15 A    Said that there were up to three or four.

16 Q    And let's talk about the identification of a shooter

17 (indiscernible).  Can you tell us about that?

18 A    Yes, sir.  Based on -- well, one of the victims knew the

19 shooter from -- he had previously been in a red and gold or a

20 Bandidos support club, as was the shooter also a member of a

21 support club.  So he knew him.  He knew him by face.  And then

22 was able to find a photograph and provide it to us saying that

23 it was the -- this gentleman was the shooter.  The Houston

24 Police Department Homicide Division did a third-party photo

25 lineup and he was able to pick out this individual who was a

1    Bandidos probationary member of the Welcome to Hell chapter.

2    Q    Okay.  And that individual is not anyone I have here

3    today.  Who was he?

4    A    His name is David Vargas.  He goes by the name -- by the

5    alias of First Time or Brake Check I guess depending on what he

6    wants to be called.

7    Q    And Mr. Vargas, he was a probationary member at the time

8    you said?

9    A    Yes.  This same rank at the time that Darvi Hinojosa was.

10   Q    Okay.  Now I am aware that the FBI and other agencies have

11   conducted some additional investigation on what exactly

12   happened that day given that there was people in the vehicle,

13   correct?

14   A    Yes, sir.

15   Q    Can you walk us through that?

16   A    Based off of the information that there were multiple

17   people involved, we had submitted and obtained a cell tower

18   dump as it's referred to here, obtained out of the Southern

19   District of Texas.  When I reviewed the dump we had of course

20   as part of the investigation been compiling Bandidos rosters,

21   names, members, et cetera, and then phone numbers.  When I was

22   looking at the cell tower dump, I found a number that was

23   utilized and a number belonging to Darvi Hinojosa in the cell

24   tower dump, which means he was in the area of the shooting.

25   Q    Okay.  And did you follow that up with any further

1    investigation or process?

2    A    Yes, sir.  Based off of that find in the cell tower dump,

3    I then obtained -- we then obtained a call detail records

4    search warrant to specifically hone in on Mr. Hinojosa's number

5    to basically isolate it and track it from all the other numbers

6    that were in the dump.  And the results of that put him almost

7    right with where the shooter, Mr. Vargas, was right before the

8    shooting.

9    Q    And the call detail records, did they also reveal anything

10   about communications Mr. Hinojosa had?

11   A    Yes, sir.  Several hours before and afterwards he was in

12   multiple communication with Mr. Vargas.  And then for the short

13   window of when the shooting took place, there was no

14   communications between the two.  And then multiple

15   communications after.

16   Q    Was all of this significant to you?

17   A    Yes, sir.

18   Q    Why?

19   A    In our experience, usually for example if you or I are not

20   in the same spot and we're messaging and talking to each other,

21   which can be (indiscernible) cell towers, if we're in the same

22   location in the same vehicle, we're no longer having messages.

23   Q    Was it consistent with Mr. Hinojosa being in the vehicle

24   that evening at the Blue Bayou shooting (indiscernible)?

25   A    Yes, sir.

1  Q    And you indicated he was a probationary member at that
2  time?
3  A    Yes.
4  Q    So next let's move forward to June 3, 2023.  We're going
5  to talk about a different I guess bar or restaurant.  This time
6  the Winters Bar in Pasadena, Texas.  Are you familiar with what
7  happened there, near there on that date?
8  A    Yes, sir.
9  Q    Okay.  So can you start us off on what led up to the
10 incident?
11 A    As the war continued between BEAST and the Bandidos, a
12 Bandidos member was present at the Winters bar and noticed two
13 BEAST members arrive.  They were recognizable by the cuts that
14 they were wearing.  And orders that he and other Bandidos had
15 received, he immediately called it in to his chapter that there
16 were BEAST members present.
17 Q    And why would someone do that in the Bandidos?  What's the
18 idea there?
19 A    The idea is to know where the rival is, to know what
20 they're doing, and then to respond, to basically establish
21 dominance of that bar or to just inflict harm, possibly steal
22 their cuts, which is another common habit to show dominance.
23 Q    Is this an expectation of members of the Bandidos and
24 their support clubs?
25 A    During war, yes, sir.

1   Q    Okay.  So a Bandido sees a BEAST at the Winters bar in

2   Pasadena.  They contact other members.  What happens next?

3   A    After the Bandido at the bar -- he made a phone call to --

4   he reported this to Darvi Hinojosa.  There was multiple

5   communications that were to Darvi Hinojosa regarding the BEAST

6   members at the bar.  There was then communication between Mr.

7   Hinojosa and two other Bandidos members who were part of the

8   Central chapter who ultimately responded to that location,

9   followed one of the BEAST members when he left, and shot him

10  seven times.

11  Q    And so did the BEAST member that was shot, what was the

12  result of those injuries?

13  A    Surprisingly, he lived.

14  Q    All right.  Just a few follow-up questions on this.  So

15  let's talk about the contact.  So how are you aware that the

16  BEAST member at the bar made contact with various individuals

17  including -- or in contact with Hinojosa?

18  A    We've done multiple interviews that said as such.  We did

19  a cellular tower dump off (indiscernible) out of the Southern

20  District that was capturing those calls.  We have the actual --

21  when we arrested Mr. Hinojosa on state cocaine trafficking

22  charges obtained a cellular phone examination warrant out of

23  the Southern District.  We saw those calls.  When we get call

24  detail record search warrant authorized out of the Southern

25  District, we saw those calls.  So multiple proofs of evidence.

1   Q    So we'll talk a little bit more about the calls in a few

2   minutes here.  But you indicated that the victim on this case,

3   they did survive, correct?

4   A    Yes, sir.

5   Q    But they sustained multiple life-threatening gunshot

6   wounds?

7   A    Yes, sir.

8            MR. BLACK:  May I approach the witness?

9            THE COURT:  Yes, you may.

10  BY MR. BLACK:

11  Q    TFO, I'm showing you now what has been marked for

12  identification as Government's Exhibits 2 and 3.  Do you

13  recognize these photos?

14  A    Yes, sir.

15  Q    How do you recognize them?

16  A    This is the victim of the shooting who was at the Winters

17  bar who was shot seven times.

18  Q    And does this depict several gunshot wounds he sustained?

19  A    Yes, sir.

20           MR. BLACK:  Government offers Exhibits 2 and 3.

21           MS. RAYNOR:  Your Honor, we are going to object to

22  these being offered into evidence.  (indiscernible) testified

23  (indiscernible) shot seven times (indiscernible).

24           THE COURT:  It's relevant.  And, I mean, this is just

25  a detention hearing.  So I'm going to admit them.

1           Actually, Mr. Troiani, any...

2           MR. TROIANI:  Yes, Your Honor.  And simply at this

3  point the Government hasn't linked this to my client.  So at

4  this point we would object until the Government can do so.

5           THE COURT:  Well, the Court can weigh the relevance

6  with respect to the individual defendants.

7           MR. TROIANI:  Right.  But we are objecting.  Thank

8  you.

9           THE COURT:  So on that basis for objection.  Okay.

10  You know, I'll consider them to the extent they are relevant.

11           (Government's Exhibits 2 and 3 entered into evidence)

12           MR. BLACK:  Understood.  May I approach?

13           THE COURT:  Yes, you may.

14  BY MR. BLACK:

15  Q   Okay.  So TFO, let's move on to the investigation into who

16  did this and who is responsible for shooting the victims at the

17  time.  So you were involved in that and aware along with other

18  members of the FBI and the Texas Department of Public Safety?

19  A   Yes, sir.

20  Q   Can you walk us through that investigation here?

21  A   After the shooting occurred, we were able to -- based off

22  the victim who was able to give a statement of the type of

23  truck and that it had a white cooler in the back of it, one of

24  our partners was able to find a truck already just placed out

25  at public surveillance cameras that was able to photograph and

1  capture a picture of the truck that had the white cooler in it
2  and we were able to notice that it had a fictitious tag on it
3  or a tag that just didn't come back to that vehicle.
4  Q    And what vehicle did it come back to?
5  A    Again, it was on a Ford F-150, but it came back to an
6  older-model Astro minivan.
7  Q    Was that (indiscernible)?
8  A    It was.  And of course it's common for someone who is
9  going to go commit a crime to put on another license place to
10 try to throw off law enforcement.
11 Q    So what else did the agent find?
12 A    That same agent was able to find the minivan using other
13 investigative means.  And when he found it, he found that it
14 was missing the license plate, that it had been taken from it.
15 Q    Now, were you eventually able to identify who that
16 vehicle, the Ford F-150 specifically --
17 A    Yes, sir.
18 Q    -- that did the shooting, who that belonged to?
19 A    Yes, sir.
20 Q    Tell us about that.
21 A    We were able to then match it with the same truck saw
22 later in the night that had the right license plate put back
23 onto it and then through other investigative means identified
24 it as belonging to a member of the Bandidos Central Houston
25 chapter.

1    Q    And that was I think a Mr. Stephen Alms.  Is that correct?

2    A    Stephen Alms, who goes by the street name Cowboy.

3    Q    So you also I know got in this investigation some cell

4    sites historical location data; is that correct?

5    A    Yes, sir.

6    Q    And tell us about what that revealed.

7    A    We of course once we identified Mr. Alms, we were able to

8    do call detail records for a search warrant authorized by this

9    district and saw his movements throughout coming from North

10   Houston down into kind of the southwest Houston area and then

11   showed a pattern of what's consistent of powering his phone

12   off.

13   Q    And was that significant to you?

14   A    Yes, sir.

15   Q    Why is that?

16   A    In our training and experience, usually members or

17   criminals that have a little bit of snap try to throw off law

18   enforcement knowing that we can track signal or track their

19   movement by cell towers, will deactivate their phone so it's

20   not communicating with the tower.  Then they'll power it back

21   on after the crime has taken place.

22   Q    So this shooting, it happened at -- it was approximately

23   1:30 a.m. on -- probably that would have been June 3, 2023.

24   A    Yes, sir.

25   Q    So the phone of Alms, it was off at that time?

1    A    He powered off.  He had talked to Mr. Hinojosa -- I don't

2    have the time right in front of me, but shortly before he

3    powered off.

4    Q    Okay.  And it was off at the time of the shooting?

5    A    Yes, sir.

6    Q    And did it subsequently turn back on?

7    A    Yes, sir.  He turned it back on at approximately 2:15 and

8    he attempted to call Mr. Hinojosa.

9    Q    So we're going to talk about Mr. Sblendorio, the other

10   individual here today in a little bit more detail in a moment

11   here regarding how he was identified.  But just so we're

12   talking about the cell site information all at once, you

13   learned that he was involved, correct?

14   A    Yes, sir.

15   Q    And you also looked for cell site information on his

16   device, correct?

17   A    Yes, sir.

18   Q    What did you find?

19   A    We were able to obtain a call detail record search warrant

20   on Mr. Sblendorio's phone.  And it showed a pattern of movement

21   towards kind of the southwest Houston area as well, wherever

22   Mr. Alms' phone had also been before it powered off.  And then

23   we saw that Mr. Sblendorio's phone showed a pattern of being

24   consistent with also powering his phone off for several hours.

25   And then he powered it back on around 4:00 in the morning.

1    Q    So again, consistent based upon your training and

2    experience (indiscernible) individuals engaged in criminal

3    activity --

4    A    Yes.

5    Q    -- avoiding tracking by law enforcement?

6    A    Yes, sir.

7    Q    So let's talk about how Mr. Sblendorio -- one of the ways

8    that he came on your radar.  And that I understand was from the

9    phone call or toll records; is that correct?

10   A    Yes, sir.  Well, when we had arrested Mr. Hinojosa on his

11   state cocaine trafficking case and we obtained a search warrant

12   here out of the Southern District to examine his phone was able

13   to see his Signal calls, which is an encrypted application that

14   many Bandidos use to communicate as it communicates with the

15   towers a little differently.  But if you have the device, you

16   can see the app.  On a call detail record, it only shows data.

17   But if -- because I had the phone, I could see the

18   communications.  And he had -- he was only communicating with

19   two individuals directly before the shooting and right after

20   the shooting.  And that was Mr. Alms and then Mr. Sblendorio.

21   Q    And was that noteworthy to you?

22   A    Yes, sir.

23   Q    And why?

24   A    Again, it kind of showed a pattern based on what we were

25   already learning based off Mr. Sblendorio's movements that he's

1    probably briefing both of them on what's going on.  And then --

2          MS. RAYNOR:  Objection, Your Honor.  Speculative.

3          MR. TROIANI:  We join, Your Honor.

4          THE COURT:  Why would you make that assumption?

5          THE WITNESS:  Because of his rank structure and that

6    he's a shot caller.

7          THE COURT:  I'm going to overrule the objection.

8    BY MR. BLACK:

9    Q    You can continue.

10   A    So based off that communication and then he even sent a

11   Signal message to Mr. Sblendorio with an instruction of letting

12   somebody take his Jeep home.

13         MR. BLACK:  May I approach the witness?

14   BY MR. BLACK:

15   Q    So, TFO, I'm showing you now what's been marked as

16   Government's Exhibits 4 and 5.  Do you recognize these items?

17   A    Yes, sir.

18   Q    Let's start with Exhibit 4.  What do you recognize those

19   items to be?

20   A    That's a timeline that we were able to put together after

21   obtaining the results of the cell tower dump, the call detail

22   records of Mr. Hinojosa and Mr. Sblendorio, Mr. Alms, the

23   forensic investigation of Mr. Hinojosa, the cell tower dump.

24   And we were able to piece it all together and build a timeline

25   of all the phone communications and locations prior to, during,

1    and right after the shooting of the BEAST member.

2    Q    Is it fair to say that this is a summary and a timeline of

3    the various --

4    A    Yes, sir.

5    Q    -- investigative information you had into a readable

6    format?

7    A    Yes, sir.

8    Q    So moving to Government's Exhibit 5.  How do you recognize

9    that?

10   A    That is a screenshot of a Signal message ring on Mr.

11   Sblendorio's cell phone that we got after his arrest and

12   obtained via the forensic exam search warrant on his phone of a

13   conversation that he -- or his communication on the Signal app

14   with Mr. Sblendorio on June the 2nd of 2023 leading up to the

15   shooting.

16   Q    And here -- we'll talk about it more in a minute.  But

17   specifically on Exhibit 5, there are text messages that you

18   mentioned earlier today, correct?

19   A    Yes, sir.

20   Q    We'll talk about that in a minute.

21            MR. BLACK:  Government offers Exhibits 4 and 5.

22            MS. RAYNOR:  No objection, Your Honor.

23            MR. TROIANI:  No objection, Your Honor.

24            THE COURT:  All right.  Government's Exhibits 4 and 5

25   are admitted for this hearing.

1          (Government's Exhibits 4 and 5 entered into evidence)

2          MR. BLACK:  May I approach?

3          THE COURT:  Yes.

4    BY MR. BLACK:

5    Q    TFO, I'm going to ask you just to kind of walk us through

6    Government's Exhibit 4, because there is a lot of information

7    there, and explain the significance of it and kind of just help

8    us put it in context.  Are you comfortable doing that?

9    A    Yes, sir.

10   Q    Okay.

11   A    And I've got that in front of me.

12   Q    Perfect.  And we start at the top with a name that we

13   haven't heard yet.  And I guess I'll help us along here.  So

14   one person I did identify, the person at Winters bar who called

15   in, hey, I see some BEAST members here, as Mr. Christohper

16   Newbie, correct?

17   A    Yes, sir.

18   Q    And what was his status with the Bandidos at that time?

19   A    He was an official Bandidos hang around.

20   Q    Okay.  And so he was in the process of becoming a member

21   of the Bandidos?

22   A    Yes, sir.  So he had a cut that had a Bandidos shield on

23   it, but he was in the first stage of becoming a Bandidos

24   member.

25   Q    Okay.  So when we see Newbie in here, that's the

1    individual at Winters bar informing others, specifically Mr.

2    Hinojosa, hey, there are Beasts here?

3    A    Yes, sir.

4    Q    Okay.  So walk us through kind of generally what we see

5    here to help us understand.

6    A    Again, there were other ways of us knowing this, but the

7    cell tower dump was the -- just evidence that we put on here

8    showing that Mr. Newbie initiated the call to Mr. Hinojosa

9    reporting that BEAST members were present.  And then throughout

10   the night, of course it looks like the first three calls are in

11   between Mr. Newbie and Mr. Hinojosa, but they spoke several

12   times throughout the night.  Whenever Mr. Hinojosa would call

13   for updates on -- if there had been any change, if more BEAST

14   members had shown up, they left, what they were wearing, et

15   cetera.

16   Q    Then eventually we get to a communication I think at 10:41

17   p.m. between Hinojosa and Alms, correct?

18   A    Yes, sir.

19   Q    And what's that consistent with?

20   A    Just consistent with as a shock collar is being able to

21   assign individuals to go to the bar and take care of it.

22   Q    And is it also consistent with other information you gave

23   in this investigation from confidential sources?

24   A    Yes, sir.

25   Q    So just kind of walk us through quickly here the high

1  points of the rest of what we see here.

2  A    Just communication between the two.  And based off the

3  CDRs we knew that Mr. Alms and Mr. Sblendorio were not in the

4  same location at the beginning when these calls were taking

5  place and that they had to have met up, and which they did in a

6  kind of basically Mr. Hinojosa talking to both of them.  And

7  then once they got together, continued to communicate with him.

8  Q    We do see, just to I guess make it clear, so the first

9  communication it looks like between Hinojosa and Mr.

10  Sblendorio, that was about 10:46 p.m.  Is that right?

11  A    Yes, sir.

12  Q    And that's on the line or paragraph tab, correct?

13  A    Yes, sir.

14  Q    And so fair to say shortly after calling Alms, Mr.

15  Hinojosa calls Mr. Sblendorio?

16  A    Yes, sir.

17  Q    And then that continues through the page.  Anything else

18  you feel like you need to note or explain on this record?

19  A    Just up on the second page as stated of whenever Mr.

20  Hinojosa was not able to get in touch with both of them because

21  they had both deactivated their phones.  And then of course at

22  2:14 a.m. when Mr. Almos powers his phone back on, his first

23  call is to Mr. Hinojosa after the shooting occurred.

24  Q    Okay.  So a number of these calls that we see from

25  Hinojosa to Alms and Sblendorio towards the end, you're saying

1  that those were calls that were attempted while Alms and

2  Sblendorio's phones were off?

3  A     Yes, sir.  When looking at Mr. Hinojosa's phone, it

4  clearly shows if a signal via the Signal app if the call is

5  connected or if it's missed.  And there were several missed

6  calls.  Because if your phone is off, it's gong to miss.

7  Q     Understood.  Now let's move on to Government's Exhibit 5.

8  You mentioned this a little bit earlier, but there's a text

9  message towards the bottom of that exhibit that I think has

10 some significance for your investigation; is that right?

11 A     Yes, sir.

12 Q     Tell us about that.

13 A     So from reviewing Mr. Hinojosa's cell phone, we were able

14 to find this message at approximately 11:04:35 p.m. where

15 Hinojosa is telling Sblendorio to let Kevin take his Jeep home.

16 Q     And why did that stand out to you?

17 A     Well, we know that Mr. Sblendorio has a Jeep.  He has a

18 little white Jeep.  And that in our investigation, we knew that

19 Mr. Sblendorio had met up with Mr. Alms and that Mr. Sblendorio

20 drove Mr. Alms' truck and had to leave his Jeep at a location.

21 When Mr. Sblendorio arrived to meet with Mr. Alms, he had

22 another Bandido that was hanging around with him named Kevin

23 Jenkins, who they are referring to here.  So Mr. Hinojosa just

24 told Mr. Sblendorio I guess now that you're driving Mr. Alms'

25 truck, just let Kevin take your Jeep home.

1   Q    So before we move on from this incident, one of the

2   sources of information that we mentioned a few times here are

3   the cooperators and confidential sources you've obtained

4   information from regarding this incident, correct?

5   A    Yes, sir.

6   Q    Now, based upon your investigation and working with those

7   individuals, do you believe them to be credible and reliable?

8   A    Absolutely.

9   Q    And what did you learn about the roles of Alms, Mr.

10  Hinojosa, and Sblendorio on what happened on June 3, 2023

11  outside of Winters?

12  A    Again, Mr. Newbie placed the call to Mr. Hinojosa

13  reporting the BEAST members being present.  Mr. Hinojosa then

14  got on the phone and talked to Mr. Alms and Mr. Sblendorio.

15  Alms and Sblendorio met up in South Houston.  Sblendorio was

16  told to drive Alms' truck.  Alms was the passenger.  Sblendorio

17  drove the truck with him and Alms over to the Winters bar.

18  They set up surveillance.  When the BEAST members left, they

19  followed -- the BEAST members split up.  One of them went on

20  the big road and one stayed on some of the roads with lights,

21  et cetera, down around the feeder.  They followed him.  When he

22  stopped at a spotlight, Mr. Sblendorio stopped behind him.  Mr.

23  Sblendorio drove the truck to the left-hand side of the BEAST

24  member where Mr. Alms shot him seven times.

25  Q    Okay.  And so driving around the left side of the victim,

1    that's so that the passenger, Alms, can shoot out the window.

2    A    Yes, sir.

3    Q    Okay.  And is this corroborated by the other evidence you

4    gained in this case?

5    A    Yes, sir.

6    Q    Specifically call records, phone records, and location

7    data?

8    A    Yes, sir.

9    Q    So also from confidential sources you learned that Mr.

10   Hinojosa made some communications with others regarding one of

11   these individuals, one of the victims in the following days,

12   correct?

13   A    Yes, sir.

14   Q    Tell us about that.

15   A    He showed a photo of the victim who was supposedly laying

16   in a bed to an individual who said this was the guy at the

17   Winters bar and he lived.

18        THE COURT:  I'm sorry, back up.  Who is saying this?

19        THE WITNESS:  I'm sorry, ma'am.  Mr. Hinojosa showed

20   the photo to an individual.

21   BY MR. BLACK:

22   Q    And you mentioned that they were in a bed.  What sort of

23   bed was this?

24   A    A hospital bed.

25   Q    Thank you.  All right.  so now let's move on to February

1    23, 2023.  We'll go through this a little more quickly here.

2    On that date, I am aware that you investigated and other law

3    enforcement investigated an assault and robbery that occurred

4    at Bimbo's bar.

5    A    Yes.

6    Q    Is that right?

7    A    Yes, sir.

8    Q    Tell us about that.

9    A    On that night there was a Bandidos regional meeting, so

10   there were numerous Bandidos there from basically every chapter

11   in the greater Houston area who attended this meeting.  Another

12   motorcycle club that basically known to be kind of sponsored

13   and friendly to the Bandidos was ordered to attend this

14   meeting.

15   Q    And what happened when they arrived?

16   A    They were confronted over an issue that had to do with

17   peace and respect with BEAST, their rival.  And then they were

18   ultimately severely assaulted and had their cuts and all their

19   personal items that were in the cuts taken off their bodies and

20   robbed.

21   Q    Just a few questions there.  We talked about cuts a few

22   times and I don't think I actually asked you to explain what a

23   cut is for the record.  What is a cut?

24   A    It's usually a leather or jean material vest that a member

25   wears.  And it has various patches on it.  Of course for the

1    Bandidos, it will have his three-piece patch.  Again, as you

2    progress, you earn certain patches.  But it makes you clearly

3    recognizable amongst themselves, amongst rivals, amongst the

4    public as a member of that motorcycle gang or, again, support

5    clubs, half-cuts as well.  And it is really kind of has your

6    story.  Your rank, your membership, violent patches you've

7    earned, runs or trips you've been on, funerals you've gone to.

8    Q    Okay.  And so the cuts that were taken from the Gray

9    Beards, what's the significance of taking someone's cut?

10   A    As part of the war, the taking of cuts is really

11   considered like the ultimate act of disrespect, the ultimate

12   act of dominance.  Like we're ripping your cut off of you, like

13   we're shutting you down.  A lot of bylaws and rules of the

14   Bandidos and other clubs basically say don't ever give up your

15   cut, don't ever come out of it.

16   Q    Now, talking about the actual assault and robbery, fair to

17   say they didn't willingly give over their cuts?

18   A    No, sir.

19   Q    It was done with use of violence?

20   A    Yes, sir.

21   Q    And how many Gray Beards were there?

22   A    We had 14.

23   Q    And approximately how many Bandidos were at the bar that

24   night?

25   A    Numbering close to a hundred.

1    Q    Was this captured on surveillance at the bar at all?

2    A    Yes, sir.  The bar had surveillance cameras.

3    Q    What did it show?

4    A    There were different angles.  The font, the sides, and the

5    back.  And that showed numerous Bandidos milling around the

6    bard.  And then the back corner of the bar, you could see a

7    group of Bandidos and where the Gray Beards were talking.  And

8    then all of the sudden a fight breaks out.

9              MR. BLACK:  May I approach?

10             THE COURT:  Yes, you may.

11   BY MR. BLACK:

12   Q    So, TFO, I am showing you now Government's Exhibits 6 and

13   7.  Do you recognize these items?

14   A    I do.

15   Q    So let's start with Exhibit 6.  What do you recognize this

16   as?

17   A    Exhibit 6 are -- again, they're smaller, but we saw bigger

18   versions of them.  These are screenshot images, stills from the

19   surveillance camera at Bimbo's where we were able to isolate

20   and recognize Darvi Hinojosa.

21   Q    And you and other agents reviewed these, correct?

22   A    Yes, sir.

23   Q    Are you both familiar with Mr. Hinojosa's appearance?

24   A    Yes, sir.

25   Q    And in watching the video, did you and others recognize

1    Mr. Hinojosa?

2    A    Yes, sir.

3    Q    And there are little arrows I think on here.

4    A    Yes.

5    Q    It's difficult to see.  But what are those arrows?

6    A    The arrows are pointing to Mr. Hinojosa as he leaves the

7    area of the assault and then walks to the front of the bar and

8    then gets on his motorcycle with the rest of his Welcome to

9    Hell chapter.

10   Q    And then let's talk about Exhibit 7.  What's that?

11   A    Exhibit 7 is a photograph that we had seen before, but we

12   also saw it on the forensic examination of Mr. Hinojosa's phone

13   after we arrested him for cocaine trafficking.  And it showed

14   the stolen Gray Beard's cuts laying on the floor of a Bandido

15   member's garage.

16   Q    And is this a screenshot or capture of that from Mr.

17   Hinojosa's phone?

18   A    Yes, sir.

19   Q    Taken subsequent.

20   A    Yes, sir.

21            MR. BLACK:  Government offers Exhibits 6 and 7.

22            MS. RAYNOR:  No objection, Your Honor.

23            MR. TROIANI:  Objection as to Mr. Sblendorio's

24   connection.

25            THE COURT:  The Court will weigh the relevance with

1   all the evidence, so the objection is overruled.

2            (Government's Exhibits 6 and 7 entered into evidence)

3            MR. BLACK:  May I approach?

4            THE COURT:  Yes.

5   BY MR. BLACK:

6   Q    So, TFO, one final point I want to make on the Bimbo's

7   assault.  So you mentioned that the surveillance cameras, they

8   don't capture the fact that the bar where the assault actually

9   occurred clearly, correct?

10  A    Not at all.  No, sir.  I mean, in terms of capturing all

11  the assault, no, sir.

12  Q    Understood.  It just kind of captures an area where people

13  would be walking out afterwards essentially?

14  A    Yes, sir.  You can see a few swings.  You can see that

15  there is a fight going on, but the entire thing is not

16  captured.

17  Q    And where on the surveillance video is Mr. Hinojosa seen

18  coming from?

19  A    Where the assault and robbery took place.

20  Q    And then you may have mentioned this, and if you have I

21  apologize.  But was anything seen on the surveillance video

22  regarding these Gray Beards' cuts?

23  A    Yes, sir.  During the assault as it was continuing, you

24  could see Bandidos members throwing the cuts into what we later

25  saw on the surveillance video to be almost like an industrial -

1    - like those big gray trashcans that have two handles on the

2    side of them.  And there might be some in the courtroom or in

3    the court building.

4    Q    Now, (indiscernible).  One last thing on Bimbo's.  Did you

5    do any investigation into who was present other than just

6    looking at surveillance video?

7    A    Yes, sir.  We did a -- we received a search warrant here

8    out of the Southern District of Texas for a cellular tower dump

9    of that bar area.

10   Q    And did that cellular tower dump show various Bandidos

11   members' numbers including that of Mr. Hinojosa?

12   A    Yes.  Numerous Bandidos.  We were able to put there

13   including Mr. Hinojosa.

14   Q    So he showed up in that area at Bimbo's during the time of

15   the assault?

16   A    Yes.

17   Q    Okay.  Last big subject on Mr. Hinojosa is drug

18   trafficking.  So during your investigation of Mr. Hinojosa, did

19   you uncover evidence that he was engaged in drug trafficking?

20   A    Yes, sir.

21   Q    What was that evidence?

22   A    Specifically cocaine.  We had made an arrest of some

23   individuals that identified the cocaine as belonging to Mr.

24   Hinojosa.  We were able to conduct some controlled purchases of

25   cocaine directly from Mr. Hinojosa.

1    Q    And let's talk about that traffic stop.  That was August
2    2, 2023, correct?

3    A    Yes, sir.

4    Q    And on that date did law enforcement stop a vehicle of a
5    Bandido member or prospect -- or I think hang around, correct?

6    A    Yes, sir.

7    Q    Leaving Mr. Hinojosa's place?

8    A    It was actually leaving John Pfeffer's place, the chapter
9    president.  But he had met up with Mr. Hinojosa in the front
10   yard.

11   Q    Okay.  And so tell us about meeting in the front yard?

12   A    Law enforcement had established surveillance at the
13   residence of the Welcome to Hell chapter president, John
14   Pfeffer, who goes by Big John.  Law enforcement observed this
15   Bandidos hang around arrive.  He walked empty-handed into the
16   front yard.  He -- law enforcement observed him meeting with
17   Darvi Hinojosa in the front yard.  Law enforcement was blocked
18   and couldn't see everything.  But then once their meeting was
19   done, they saw the hang around head back to his vehicle and he
20   was carrying a bag that he did not have when he arrived.  The
21   hang around guy, his vehicle had left and was pulled over for
22   traffic violations.

23   Q    And during a subsequent search of that hang around's
24   vehicle, was that bag the hang around was seen walking back to
25   their vehicle with from Hinojosa recovered?

1   A    Yes, sir.

2   Q    And what if anything was found in that bag?

3   A    Approximately 12 grams of cocaine.

4   Q    Were there also visual scales in that bag?

5   A    Yes, sir.

6   Q    And was there also a loaded firearm magazine?

7   A    Yes, sir.

8   Q    So next just quick here, on October 1, 2023 using a

9   confidential informant did law enforcement conduct a controlled

10  purchase of cocaine from Mr. Hinojosa?

11  A    Yes, sir.

12  Q    And was that of approximately 6.8 grams of cocaine?

13  A    Yes, sir.

14  Q    And that occurred here in the Southern District of Texas?

15  A    Yes, sir.

16  Q    And next on October 14th, 2024, on that date did a

17  confidential source conduct a controlled purchase of one ounce

18  of cocaine from Mr. Hinojosa?

19  A    Yes, sir.

20  Q    And that also occurred here in the district?

21  A    Yes, sir.

22  Q    We talked a few times about Mr. Hinojosa's phone and

23  searching it following one of his arrests.  Did that also

24  reveal evidence of drug trafficking?

25  A    Yes, sir.  A lot of evidence spanning a few years of

1  cocaine trafficking.

2          MR. BLACK:  May I approach the witness?

3          THE COURT:  You may.

4  BY MR. BLACK:

5  Q    TFO, I am showing you now what's been marked as

6  Government's Exhibit 8, 9, and 10.  Do you recognize these?

7  A    I do.

8  Q    How do you recognize them?

9  A    These are just some of the isolated messages regarding Mr.

10 Hinojosa's cocaine trafficking that was recovered from his cell

11 phone.

12 Q    Fair to say this is just a small sampling of some of those

13 messages?

14 A    Small sample.

15         MR. BLACK:  Government offers exhibits 8, 9, and 10.

16         MS. RAYNOR:  No objection, Your Honor.

17         MR. BLACK:  May I approach?

18         THE COURT:  Mr. Troiani?

19         MR. TROIANI:  And as to Mr. Sblendorio, again, this

20 has to do with Mr. Hinojosa.

21         (Government Exhibits 8, 9, and 10 entered into

22 evidence)

23 BY MR. BLACK:

24 Q    TFO, could you just kind of walk us through Exhibits 8, 9,

25 and 10 and what's in those?

1    A    Oh, I'm sorry.  That's ten, yeah.  Yeah.

2    Q    Starting with Government's Exhibit 8, could you just

3    quickly tell us based upon your training and experience what

4    that conversation is regarding (indiscernible) in that

5    conversation?

6    A    Yes, sir.  Exhibit 8 is an individual by the name of

7    Skinner who we know to be a Banditos member of the Welcome to

8    Hell chapter who goes by Skinner or Skin Man.  And he was

9    messaging Mr. Hinojosa on February 23rd of this year asking him

10   if -- that he wants to get a ball, which is in narcotics terms

11   refers to an eight ball of cocaine, which is 3.5 grams.

12   Q    And then there's a response from someone whose name on the

13   phone is D Money saying okay.  Who is that?

14   A    From looking at the cell phone, that's how -- when you do

15   encrypted messages, you can come up with your own name.  And of

16   course when you look at the forensic examination and it says

17   whose phone it is and it identifies Mr. Hinojosa.  It also has

18   what their names on their accounts are.  So you can call

19   yourself whatever you want.  But the green is his phone.  And

20   his nickname in there is D Money.

21   Q    Okay.  So in the application being used to review this,

22   the green messages are Mr. Hinojosa?

23   A    Yes, sir.

24   Q    So next moving on to Government's Exhibit 9.  What is

25   this?

1    A    It's just another messages from February of this year

2    where, again, in this conversation Mr. Hinojosa, that's just

3    his number.  He doesn't have a nickname in this conversation.

4    But he had sent a message to this individual who has a nickname

5    of Ocho, which means eight, that Mr. Hinojosa is saying that

6    he's got some -- if you translate that into narcotics terms,

7    that he's got some new good cocaine in and that it's $700 for a

8    zip, which is an ounce, which is common for an ounce of

9    cocaine.

10   Q    And finally, Government's Exhibit 10.  Can you summarize

11   what you see there?

12   A    A conversation between Mr. Hinojosa again.  In this

13   conversation he has his nickname of D Money.  Mr. Andy Rivera

14   has initiated contact with Mr. Hinojosa saying he got his

15   number from his buddy, Corky.  Corky is a Bandidos member out

16   of the Sblendorio chapter who Mr. Hinojosa had also supplied

17   with cocaine per messages.  Mr. Rivera is asking Mr. Hinojosa

18   if he can come through and basically -- which is -- sometimes

19   they are not as clear on messages.  Like hey, can I get an

20   ounce of cocaine.  It's just hey, can I come see you.  Again,

21   sometimes they say hey, can I get a ball, but they don't

22   typically come out and say exactly what they're looking for in

23   case law enforcement recovers the message.

24        But Mr. Hinojosa actually asked him, hey, what are you

25   looking for.  And then he asked him what's your eight running,

1    which is basically asking for that amount for an eight ball.

2    Q    Thank you.  And let's talk about two days ago at this

3    point.  So you're aware that Mr. Hinojosa, an indictment was

4    returned by the grand jury here and a warrant was issued for

5    his arrest?

6    A    Yes, sir.

7    Q    And also did law enforcement secure a warrant to search

8    his residence and some of his vehicles?

9    A    Yes, sir.

10   Q    Are you familiar with the search and arrest operation for

11   Mr. Hinojosa?

12   A    Yes, sir.

13   Q    So tell us about (indiscernible).

14   A    Law enforcement, based off of the violent history of our

15   investigation of Mr. Hinojosa, the FBI Houston SWAT Team made

16   the entry, secured the arrest of Mr. Hinojosa on the federal

17   warrant.  And then FBI and law enforcement search team executed

18   the search warrant.

19   Q    What if anything of relevance was recovered inside of the

20   residence?

21   A    Cocaine, his Banditos cut, his cell phone and some firearm

22   magazines.

23   Q    What was the cell phone -- what state was in when it was

24   recovered by law enforcement?

25   A    It looked like it had been shattered, cracked.

1   Q    It appeared to be damaged?

2   A    Yes, sir.

3   Q    Was it still powered on, however?

4   A    I believe it was, yes, sir.

5           MR. BLACK:  May I approach the witness?

6           THE COURT:  You may.

7   BY MR. BLACK:

8   Q    So (indiscernible) Government's Exhibits 11 through 22.

9   A    Mm-hmm.

10   Q    Do you recognize (indiscernible)?

11   A    Yes.

12   Q    Do you recognize those exhibits?

13   A    I do.

14   Q    How do you recognize them?

15   A    As the items of evidence that were either photo'd and

16   collected or just photographed at Mr. Hinojosa's residence.

17   Q    So these are (indiscernible) you just described?

18   A    Yes, sir.

19           MR. BLACK:  Government offers Exhibits 11 through 22.

20           MS. RAYNOR:  No objection, Your Honor.

21           MR. TROIANI:  None from Mr. Sblendorio.

22           THE COURT:  Let me ask, how much more evidentiary

23   presentation do you have?  Because it's already 10:00.  I've

24   got three more hearings at 10:00.

25           MR. BLACK:  Yes, Your Honor.  So Mr. Sblendorio's

1    (indiscernible).  However, (indiscernible).

2              THE COURT:  Okay.  Well, just keep things moving.

3              MR. BLACK:  Okay.  Thank you.

4              (Government exhibits 11 through 22 entered into

5    evidence)

6              MR. BLACK:  May I approach?

7              THE COURT:  Yes.

8    BY MR. BLACK:

9    Q    Okay.  TFO, we'll do our best to speed things up here.  If

10   we can kind of quickly go through Exhibits 11 through 22 and

11   describe what we're seeing.

12   A    Eleven are some lose firearm rounds, live firearm rounds

13   that were recovered in the residence.  Exhibit 12 is a bag of

14   cocaine that was in Mr. Hinojosa's residence, which is a

15   violation of the bond conditions.  A pistol magazine for a

16   Ruger that was in the house.  Numerous Bandidos paraphernalia,

17   patches, et cetera.  And that's in Exhibit 14.  The one of note

18   is the Safari Team, which is a violent designation patch that

19   you're actually out hunting BEAST members.

20   Q    Okay.  Any --

21   A    Exhibit 15, his wallet of the SS Crew, which is an

22   enforcer crew that goes out and commits violence.  An Expect No

23   Mercy ring, his Bandidos cut, which again has Expect No Mercy

24   and the SS Crew, which are basically violent designators.  11,

25   a baggie of cocaine.

1  Q    Exhibit 19.  I'm sorry.  That's --

2  A    I'm sorry, yeah.  Yeah, 19.  I was looking at the evidence

3  tab.

4  Q    And 18 I know we went over quick here, but is this a

5  picture of the front of his cut?

6  A    Yes, sir.

7  Q    And then it has his rank on it?

8  A    Yes, sir.  Sergeant at arms, his Welcome to Hell chapter,

9  and then again Expect No Mercy and the SS Crew lightning bolts.

10  Q    Exhibit 20?

11  A    Exhibit 20 is some cocaine and cocaine baggies and scale

12  that were in Mr. Hinojosa's father's room, who we had received

13  information was actually supplying Mr. Hinojosa with cocaine,

14  Darvi Hinojosa with cocaine.

15  Q    And Exhibits 21 and 22, those are the front and back of a

16  cut; is that right?

17  A    Yes, sir.  Mr. Hinojosa's father is a member of a Bandidos

18  support club.  And that's basically a good view of what a

19  support club cut looks like with the 22, that Bandidos

20  (indiscernible).  Basically with that you're an official

21  Bandidos support club.

22  Q    Okay.  And so now we are going to move on to Mr.

23  Sblendorio.  So are you familiar with Mr. Sblendorio from your

24  investigation into the Bandidos?

25  A    Yes, sir.

1   Q    What can you tell us about his association or membership

2   in the Bandidos?

3   A    We had identified Mr. Sblendorio as a member of the

4   Central Houston chapter of the Bandidos.  The Central Houston

5   chapter and the Welcome to Hell chapter are very close, almost

6   like brother chapters.  And they're usually always together.

7   Q    And when you say he's a member, what's his status?  Is he

8   probationary or is he fully patched?

9   A    He's a fully patched member.  He even held the rank of

10   secretary.

11   Q    Okay.  So he has previously held that rank within the

12   chapter?

13   A    Yes, sir.

14   Q    Does he have any alias or nickname you're aware of?

15   A    Yes, sir.  He goes by the alias of Tech Nine.

16   Q    Now, I'm aware there's been kind of some change at the

17   status within the Bandidos over the years, and that's

18   significant to you.  Can you tell us about that briefly?

19   A    Yes, sir.  Of course he had to earn -- he had to prospect

20   and he had to earn his way to become a Bandido.  You know, you

21   prospect for six months, you earn the right to become a member.

22       He was disciplined and basically bumped back down to a

23   prospect, which means that he violated rules.  We have some

24   text messages that say that I guess he was questioning orders

25   or not following orders well enough.  And he was made a

1    prospect again.  And he wanted to earn it back.  So he stayed

2    in and put in the work.  Had a chance to leave the Bandidos,

3    but he stayed in and became a member again.

4    Q    Based upon your knowledge of the Bandidos and motorcycle

5    gangs in general, is the fact that he prospected noteworthy?

6    A    It is.  It shows pretty much a diehard loyalty to the

7    gang.

8    Q    And prospecting, is that an easy process?

9    A    It is not.  We've had people say it's hell on earth.

10   Q    Okay.  So I'm going to show you a few items.  Government's

11   Exhibits 23 through 25.

12            MR. BLACK:  May I approach the witness?

13            THE COURT:  Yes, you may.

14   BY MR. BLACK:

15   Q    TFO, I am showing you now three items marked 23, 24, and

16   25.  Do you recognize these items?

17   A    I do.

18   Q    How do you recognize them?

19   A    These are photos that we were able to recover on social

20   media of Mr. Sblendorio and his girlfriend.

21   Q    And Mr. Sblendorio -- well...

22            MR. BLACK:  Your Honor, Government offers Exhibits

23   23, 24, and 25.

24            MR. TROIANI:  No objection, Your Honor.

25            THE COURT:  Government's Exhibits 23, 24, and 25 are

1    admitted for this hearing.

2              (Government's Exhibits 23, 24, and 25 entered into

3    evidence)

4              MR. BLACK:  May I approach?

5              THE COURT:  Yes, you may.

6    BY MR. BLACK:

7    Q    So TFO, can you walk us through each of these quickly here

8    telling us the significance as far as really what Mr.

9    Sblendorio is wearing?

10   A    He is wearing -- at this time, you know, not being a

11   prospect, he is wearing his Bandidos cut of a full patch

12   member.  You see on Exhibit 23 how the back of a full patch

13   Bandidos member's cut looks with the one percent diamond

14   advertising yourself as an outlaw.  The savage -- pardon my

15   language, the Savage Motherfuckers tab at the bottom is a patch

16   that's commonly worn by the violent chapters of Welcome to Hell

17   and Central.  Even though he -- I'm sorry.  And then Chapter 24

18   is pretty much the same patch.

19             Twenty-five you can see.  And the front of his cut, which

20   basically a Bandido will wear his chapter, his primary chapter

21   tab over his heart.  And he has Central Houston.  Underneath it

22   he has Welcome to Hell, which certain chapters will give you

23   their chapter patch you can put on if you ever spent a lot of

24   time with them, commit a crime with them and they really trust

25   you as kind of one of their own.  So he's got both chapter tabs

1    on.

2    Q    So Mr. Sblendorio -- we already really talked about kind

3    of earlier in talking about the attempted murder at Winters on

4    June 3, 2023.  But can we just kind of -- I'm obviously going

5    to speed this along here.  Fair to say just as a reminder your

6    investigation showed he was the driver during the attempted

7    murder of the BEAST victim on that date?

8    A    Yes, sir.  He drove Mr. Alms up to the biker -- up to the

9    victim and shot him seven times.  And then they evaded.

10   Q    So we'll move forward now to two days ago in this case.

11   Like Mr. Hinojosa, was there also an indictment returned by a

12   federal grand jury against Mr. Sblendorio along with an arrest

13   warrant?

14   A    Yes, sir.

15   Q    And then additionally like Mr. Hinojosa, did law

16   enforcement seek a warrant to search his residence and some of

17   his vehicles?

18   A    Yes, sir.

19   Q    Are you familiar with those searches and his arrest?

20   A    Yes, sir.

21   Q    Can you tell us about it?

22   A    The same as Mr. Hinojosa.  Based off the violent nature of

23   the crimes being alleged and the violent nature of the

24   Bandidos, FBI SWAT team initiated the surround and call out and

25   arrested Mr. Sblendorio.  And then myself and law enforcement

1  executed the federal search warrant on his residence.

2  Q    What if anything of relevance was found inside that

3  residence?

4  A    A lot of Bandidos paraphernalia of course.  Inside of the

5  garage on one of his motorcycles in the saddlebag was body

6  armor.  And then inside of a patch, almost like a fanny pack by

7  the handlebars for quick accessibility was a magazine loaded

8  with ammunition that would just insert into a semiautomatic

9  (indiscernible).

10 Q    And why did that stand out to you?

11 A    Basically these Bandidos members who know that they are at

12 war are ready to quickly access a firearm and/or have body

13 armor because they know that they could also be shot at by

14 rivals, either premeditated or in response to what they're

15 doing.

16       Also in Mr. Sblendorio's truck parked in the driveway was

17 a bag that we have identified as being a blackout kit.

18 Q    What is that?

19 A    In our investigation, members of the Welcome to Hell and

20 Central Houston chapters carry what's called like a blackout

21 bag.  Like us in law enforcement carry what we call a go bag

22 sometimes.  And it's got necessary equipment in it if we have

23 to tactically deploy in an emergency tactical situation

24 usually.

25       The blackout bag for the Bandidos, when we opened Mr.

1 Sblendorio's, it's all black clothing and black surgical gloves

2 as you would wear not to leave fingerprints or gunshot residue

3 on your hands.

4 Q    And you probably mentioned it, but there was cocaine

5 recovered in the residence, correct?

6 A    Yes, sir.  And inside of his gun safe where he had all of

7 his firearms was cocaine.

8 Q    And then also you said multiple firearms?

9 A    Yes, sir.

10          MR. BLACK:  May I approach?

11          THE COURT:  Yes, you may.

12 BY MR. BLACK:

13 Q    I'm showing you Government's Exhibits 26 through 40.  Fair

14 to say that these are all photographs from the search of Mr.

15 Sblendorio's residence a few days ago?

16 A    Yes, sir.

17          MR. BLACK:  Government offers Exhibits 26 through 40.

18          MR. TROIANI:  No objection.

19          MR. BLACK:  May I approach?

20          THE COURT:  Yes, you may.  The Court will admit

21 Government's Exhibits 26 through 40 for purposes of today's

22 hearing.

23          (Government Exhibits 26 through 40 entered into

24 evidence)

25 BY MR. BLACK:

1    Q    So TFO, quickly -- I know some of these aren't too

2    terribly interesting, but some do have more relevance than

3    others.  Can you walk us through Exhibits 26 through 40?

4    A    Yes, sir.  I somehow managed to put them out of order.  My

5    apologies.  Just the one I have in front of me is 27 and 28.

6    It's just a picture of Mr. Sblendorio's cut.  He had basically

7    earned this one back a second time after he got bumped down to

8    prospect.  This is his cut now that he was rewarded his

9    Bandidos cut.

10        Exhibit 29 is his Bandidos membership card, which is

11   almost like a business card that Bandidos carry around that

12   will have their chapter president, their chapter, their

13   nickname, the date they became a Bandido, et cetera.

14   Q    And on the card, if you go to 29, it says 5/11/2023.  Does

15   that look right?

16   A    Yes, sir.

17   Q    Okay.  And based upon your investigation, how long has Mr.

18   Sblendorio been associated or a member of the Bandidos?

19   A    Since before then.  I don't remember how long before then,

20   you know, like a hand around type status.

21   Q    Okay.

22   A    But he has been (indiscernible).

23   Q    So that date on there would have been his full membership

24   date, but he had association prior?

25   A    Yes, sir.

1          MR. TROIANI:  Objection.  Calls for speculation, Your

2     Honor.

3          THE COURT:  Do you know when Mr. Sblendorio first

4     became I guess a member of the Central Houston?

5          THE WITNESS:  It was -- I don't have that in front of

6     me, Your Honor.  It should be on the (indiscernible) record and

7     I just don't recall it.

8          THE COURT:  But do you recall his name being

9     associated with Central Houston before May 11th, 2023?

10         THE WITNESS:  Yes, ma'am.

11         THE COURT:  Objection overruled.

12    BY MR. BLACK:

13    Q    All right.  Moving on to Exhibit 30.

14    A    I'm sorry.  Yes.  I'm trying to find 30, sir.  I don't see

15    30.  I might have -- oh, I'm sorry.  It's on this.  30 is just

16    some of his Bandidos patches that he has framed.  Again,

17    Bandidos are very proud of who they are and the patches that

18    they've gotten or awarded.  He has these in frames in his

19    house.

20         Thirty-one is his girlfriend's cut.  A lot of girlfriends

21    or wives actually become what they call Bandidos Old Ladies.

22    They are considered property.  And that's how the cuts read is

23    property of Bandido Tech Nine.  That's how they view their

24    females, as property.

25    Q    Exhibit 32?

1    A    Thirty-two is the cocaine in place inside of his safe.  33

2    is the cocaine once it's been removed.  34 is additional

3    cocaine that was wrapped inside of a five-dollar bill, which is

4    common.  In my training and experience, a lot of members put

5    narcotics not just in a folded dollar bill of some kind because

6    it keeps it packed, but if they carry that in a wallet, law

7    enforce sometimes just sees the cash and they don't bother to

8    open it.  They just see the cash.  And it's got usually

9    cocaine, and like this one did, folded inside of the U.S.

10   currency.

11        Thirty-five is what the gun safe looks like before we

12   recovered anything out of it.  That's where his cut was.  And

13   you can see the firearms, pistols, shotgun.  A lot of brass

14   knuckles and knives.

15        Thirty-six and 37 are the two pistols that we recovered.

16        Thirty-eight is the fanny pack by the handlebars of the

17   motorcycle where the magazine with the ammunition was.

18        Thirty-nine is the blackout kit that was underneath the

19   seat of his truck in the driveway.  40 is the contents of the

20   blackout bag.  As you can see how that would come in common at

21   night or it be used at night.

22        Forty-two is a --

23   Q    And we're not quite to 42 yet.

24   A    I'll slow down.

25   Q    No worries.  Okay.  So let's actually get to the subject

1  matter around 42, which is (indiscernible). So I am aware that

2  during preparations for the search in Mr. Sblendorio's

3  residence and then during the search, you learned some

4  information regarding a domestic assault that occurred the day

5  before the search, correct?

6  A    Yes, sir. When the FBI SWAT team had secured the -- they

7  were still securing the residence. Mr. Sblendorio had already

8  been placed under arrest on a federal warrant. As I was

9  standing out there ready to take control of the scene for the

10  search warrant, I had a neighbor come up to me and report that

11  there had been a domestic violence incident at the residence

12  the day before. Which I had conducted surveillance at the

13  residence. What I found out, I arrived about 30 minutes after

14  the domestic violence had occurred. So some of what I saw the

15  day before was explained on what happened by this neighbor.

16  Q    Let's talk about what the neighbor told you and then we'll

17  talk about what he saw. So what did the neighbor tell you?

18  A    The neighbor said that the day before John Sblendorio's

19  girlfriend had run over to her house frantically and rang the

20  doorbell, which they per her ring camera everything was

21  recorded.

22       She said that the girlfriend, named Maddie, was

23  hysterically crying and saying that Mr. Sblendorio had

24  chokehold her and threw her to the floor and I guess kept her

25  down for awhile and then took her phone. And then she fled

1    from the residence to this neighbor and basically the neighbor

2    took her in and secured her for awhile until Maddie called her

3    mother to come pick her up.

4    Q    Now, did the neighbor show you anything regarding any

5    evidence of what happened?

6    A    Yes.  She had been able to take a photograph of the

7    victim, Maddie and showed a red mark around the upper chest

8    towards the neck.  And then she was able to recover the video

9    of the Ring doorbell camera showing pretty much the incident

10   went down exactly as the neighbor reported it of what Maddie

11   said, Mr. Sblendorio chokehold her to the ground.

12             MR. BLACK:  Okay.  May I approach the witness?

13             THE COURT:  Yes, you may.

14   BY MR. BLACK:

15   Q    I'm showing you now what's been marked as Government's

16   Exhibit 42.  Do you recognize that?

17   A    I do.

18   Q    Is this the photograph you received of Mr. Sblendorio's

19   girlfriend from the neighbor?

20   A    Yes, sir.

21             MR. BLACK:  Government offers Exhibit 42.

22             MR. TROIANI:  No objection, Your Honor.

23             THE COURT:  All right.  Government's Exhibit 42 is

24   admitted for today's hearing.

25             (Government Exhibit 42 entered into evidence)

1        MR. BLACK:  May I approach?

2        THE COURT:  Yes, you may.

3    BY MR. BLACK:

4    Q    Now, TFO, in the Government's Exhibit 42, can you just

5    orient us briefly?

6    A    This is the victim, Maddie, who is in the courtroom.  And

7    you can see a red mark towards her upper-left chest kind of

8    above where her heart would be, up towards the bottom of the

9    neck area.

10   Q    And then also I'm going to show you a thumb drive.  And on

11   this thumb drive is what is Government's Exhibit 43.  It's that

12   Ring video, correct?

13   A    Yes, sir.

14   Q    Have you reviewed that Ring video?

15   A    I have multiple times.

16   Q    And it's that same Ring video that (indiscernible),

17   correct?

18   A    Yes, sir.

19        MR. BLACK:  Government offers Exhibit 43.

20        MR. TROIANI:  Your Honor, we have not had an

21   opportunity to view this video, nor have we seen it.  And it

22   would not be 43 because 43 is actually --

23        MR. BLACK:  Oh, I'm sorry, (indiscernible).

24        THE COURT:  Wait.  What is the purpose of offering 43

25   if it's just a...

1    MR. BLACK: I misspoke, Your Honor. It's Exhibit 41.

2  43 is a different case. Exhibit 41 is the Ring video from the

3  neighbor.

4    THE COURT: Okay. Let's just move on. We don't need

5  to watch all the Ring videos. Yeah.

6    MR. BLACK: Okay.

7    THE COURT: Okay.

8    MR. BLACK: In that case, Your Honor --

9    THE COURT: I mean, so we would have to sit here and

10  play this whole thing because they haven't had an opportunity

11  review it.

12    MR. BLACK: So I disclosed it last night

13  (indiscernible).

14    MR. TROIANI: Your Honor, we are going to object.

15  The Court has already heard testimony and we would like to have

16  an opportunity to present our position of the --

17    THE COURT: Yeah, okay. I mean at this point it's

18  just duplicative. So let's -- we're going to disregard -- I

19  have already heard the testimony about what the footage shows.

20  All right.

21    MR. BLACK: Is it in the record?

22    THE COURT: No. Let's just move on.

23    MR. BLACK: Okay. Then -- I have one further

24  question.

25  BY MR. BLACK:

1    Q    So I wanted to save this for the end.  But TFO, do you see

2    any other members of Bandidos in the courtroom today?

3    A    I do not unless there's one hidden.

4    Q    Okay, fair enough.  Just wanted to check.  Thank you.

5              THE COURT:  All right.  This is a little unorthodox -

6    -

7              THE WITNESS:  I mean other than some of the subjects,

8    yes.

9              MR. BLACK:  Correct.

10             THE COURT:  Okay.  Given how late we're running, we

11   have a 10:00 arraignment for Mr. Christian Morris.  Are counsel

12   --

13             MR. TROIANI:  Your Honor, I would propose if you want

14   to take the arraignment and call us back.

15             THE COURT:  That's what I was going to do.  Just

16   because I hate to have them sitting around for so long when

17   it's just an arraignment.

18             MR. TROIANI:  Completely understand.

19             THE COURT:  Okay.  So do we have the parties and

20   counsel here for Case 4:23-CR-314, United States v. Christian

21   Morris?

22             (Recess)

23             THE COURT:  All right.  We are back on the record in

24   4:24-CR-543, United States v. Darvi Hinojosa and John

25   Sblendorio.  All right.

1      So, Mr. Black, are you finished with your direct

2  examination?

3          MR. BLACK:  I am, Your Honor.

4          THE COURT:  Okay.  And then -- uh-oh.  We need

5  counsel.  Yeah.

6          Where did everybody go?

7          All right, let's get going.  Who is first?  Ms.

8  Rayno?

9          MS. RAYNOR:  I can go first.  Yes, Your Honor.

10              CROSS-EXAMINATION OF JOSHUA LYONS

11  BY MS. RAYNOR:

12  Q    Is it proper to call you Agent Lyons?

13  A    Ma'am, you can call me Josh.  It doesn't matter.  Thank

14  you though.

15  Q    Okay.  Agent Lyons (indiscernible) some pretty sweeping

16  accusations about all Bandidos (indiscernible).  Is it your

17  testimony today that every member of the motorcycle club, the

18  Bandidos motorcycle club was a criminal?

19  A    I did not say that.

20  Q    So there may be some people who are not participating in

21  illegal activity in that club, correct?

22  A    There are many that just are never caught.

23  Q    So are they all criminals or -- who have not been caught,

24  is that what you're saying?

25  A    I guess we'll have to see if we end up violent indictments

1  on them.

2  Q    So is it possible that some people in that organization

3  are not criminals?

4  A    Yes, ma'am.

5  Q    Did individual Mr. Hinojosa join the Bandidos back in

6  2021, is that what you said?

7  A    Yes, ma'am.

8  Q    Starting -- involved in a new chapter, correct?

9  A    Yes, ma'am.

10  Q    Prior to 2021 did Mr. Hinojosa have any criminal record?

11  A    I don't recall seeing any.

12  Q    Okay.  And aside of the two (indiscernible) that he has

13  for possession of distribution of cocaine, he actually has not

14  been convicted of those crimes, correct?

15  A    Of the ones that we arrested him on, he has not been

16  convicted.  He's on bond for those.  Yes, ma'am.

17  Q    Okay.  So it's safe to say he has actually no criminal

18  convictions on his record?

19  A    I'd have to relook at the record.  But if you have it in

20  front of you and there's no convictions, then yes, ma'am.

21  Q    Okay.  You testified about two shootings, one occurring in

22  -- I didn't get the date on the first shooting you testified

23  on.

24  A    The Blue Bayou one?

25  Q    Yes.

1    A    That was November 2nd of 2021.

2    Q    2021.

3    A    Yes, ma'am.

4    Q    And that was one month after Mr. Hinojosa had joined --

5    A    Thereabouts, thereabouts.  Yes.

6    Q    And you testified that there was cell phone records that

7    linked him to the scene of the crime; is that correct?

8    A    Yes, ma'am.

9    Q    The data that you reviewed, the cell phone data that you

10   reviewed, you also testified that it put him in the vehicle.

11   Is that correct?

12   A    I didn't testify that that put him in the vehicle; I said

13   it put him near where the other -- where the other suspect that

14   had been identified was.

15   Q    Okay.  And you're aware that cell phone data is not an

16   exact science; correct?

17   A    It's pretty accurate based off the accuracy of the company

18   on how exact the coordinates are.  And I can't -- not being the

19   expert on those, I don't feel comfortable commenting on -- each

20   company's records can be a little closer than others.

21   Q    But it's also safe to say that cell phone data with

22   respect to placing a person at or near a vicinity, there is a

23   probably big margin of error there as well, correct?

24   A    I disagree.

25   Q    Well, let's quantify it.  I can be five miles away from a

1  coordinate and still be considered at or near the scene; isn't

2  that correct?

3  A    You might be near it.  But the way that this works is it

4  depends on what tower you're hitting off of.

5  Q    Correct.  And if there's more than one tower in the area

6  and I may be closer to one tower than the other, is that

7  correct?

8  A    It will show that.

9  Q    So we don't particularly know whether he was at the scene,

10 right?

11 A    Particularly at what scene?

12 Q    The first shooting.

13 A    He's within the radius of the shooting.  Exactly where

14 specifically, spot he was standing, I don't...

15 Q    But we don't know that he was at the scene, particularly

16 at the scene, right?

17 A    His phone was in there.

18 Q    Puts him exactly at the scene?

19 A    It puts him in our general crime scene, which was actually

20 several different locations on where the rolling shootout was.

21 Q    But it could have been five miles away, right?

22 A    No, ma'am.  Not five miles away.

23       MS. RAYNOR:  One second, Your Honor.

24 BY MS. RAYNOR:

25 Q    You also testified at the first shooting that there was a

1    dark-colored SUV that was (indiscernible), correct?

2    A    Yes, ma'am.

3    Q    Did you identify who that dark-colored SUV belonged to?

4    A    We never got the plate off of it.

5    Q    Okay.  Let's take you to the June 3rd, 2023 shooting.  The

6    victim in that shooting survived, correct?

7    A    Yes, ma'am.

8    Q    And it's your testimony that the cell phone data also

9    linked Mr. Hinojosa to that shooting, correct?

10   A    Yes, ma'am.

11        MS. RAYNOR:  May I approach the witness, Your Honor?

12        THE COURT:  You may.

13   BY MS. RAYNOR:

14   Q    I'm showing you Exhibit 5.

15   A    Yes.

16   Q    (indiscernible).  Can you tell me the date (indiscernible)

17   timestamp (indiscernible)?

18   A    Those are the timestamps.  The 10:46 and then the 10:52

19   (indiscernible) 11:01.  And sometimes the UTC code will be

20   wrong in terms of -- not wrong, I'm sorry.  Pardon that.  It is

21   in another time zone and you have to put it in our time zone.

22   But these are in the Central Standard.

23   Q    And you said 10:56 or 10:57 was the last ones?

24   A    Well, these aren't the last ones.  This is just some

25   isolated ones.  I believe there's more messages before and

1   there's messages after.

2   Q    And the time the victim was shot was around 1:30 a.m. in

3   the morning?

4   A    Yes, ma'am.  On June the 3rd.

5   Q    Two or three hours prior on the (indiscernible) text

6   message, right?

7   A    After those messages, there are other messages.

8   Q    But they are not presented here today, correct?

9   A    They might be on that other exhibit, ma'am, the one you're

10  looking at.

11  Q    (indiscernible)?

12  A    Yes, ma'am.  I believe that's it.

13  Q    I thought this was outgoing calls, not --

14  A    It's both.  Well, and like what you're looking at, ma'am,

15  in that other exhibit --

16          MS. RAYNOR:  Your Honor, may I approach the witness

17  again?

18          THE COURT:  Yes.

19  BY MS. RAYNOR:

20  A    I'm sorry.  And what you were looking at shows both text

21  messages and missed calls.  And that's how the Signal app

22  works.  It will show a message or a call.

23  Q    You're referring to Exhibit 4, is that correct?

24  A    Yes, ma'am.

25  Q    (indiscernible) calls (indiscernible).

1    A    This is pretty much -- yes, these are -- per his exam,

2    he's using the signal app to place phone calls to these various

3    individuals.  And you don't have all of those.  That I guess is

4    just a screenshot of some of the messages.  This is the summary

5    of all of the Signal calls for Mr. Hinojosa to the other

6    suspects.

7    Q    And what time was the last one?

8    A    Sell, Mr. Hinojosa attempted to call Mr. Sblendorio in

9    terms of calling out at 12:24:25 and then -- which was about an

10   hour before the homicide.  I'm sorry, that wasn't a homicide.

11   Before the shooting.  And then at 2:15, Mr. Alms powers his

12   phone back on, which was about 45 minutes after the shooting

13   Mr. Alms attempted to call Mr. Hinojosa.

14   Q    But the cell phone records don't depict what was stated on

15   those calls, correct?

16   A    The only content we have is that one message you see in

17   front of you in green on that other exhibit.

18   Q    And that message was being let Kevin take your Jeep home,

19   right?

20   A    Yes, ma'am.

21   Q    And it's not your testimony that Mr. Hinojosa was present

22   at that particular shooting, right?

23   A    Was not present.

24   Q    And we don't know what was stated an hour before the

25   shooting or approximately an hour after the shooting, right?

1   A     The specifics, no, ma'am.

2   Q     So are you aware of any incident in which Mr. Hinojosa has

3 (indiscernible), are you aware of any incidents where he has

4 not shown up to court or fled, anything like that?

5   A     Fled law enforcement, no, ma'am. I don't believe he's

6 missed any court dates because we haven't seen any warrants pop

7 up for that.

8   Q     And again, you're not aware of any criminal history that

9 he has or any further convictions on his record?

10   A     Just the numerous cases we have on him.

11   Q     No convictions.

12   A     No, ma'am.

13         MS. RAYNOR: Your Honor, I'll pass the witness.

14         THE COURT: Mr. Troiani?

15         MR. TROIANI: Yes, Your Honor.

16 BY MR. TROIANI:

17   Q     Good morning, TFO Lyons.

18   A     Good morning, sir.

19   Q     Sir, my understanding is you're not an expert in

20 cybersecurity, correct?

21   A     In cybersecurity?

22   Q     Sure.

23   A     I would not call myself an expert in anything. Other

24 people would have to do that.

25   Q     And you are not an expert in triangulation as far as cell

1    phone data, correct?

2    A    Again, sir, other people would have to put expert on.  I

3    would never call myself that.

4    Q    And we don't -- and if we look at Exhibit 4, we don't have

5    any coordinates and we have no supporting documentation other

6    than a listing of possible calls and texts that were compiled I

7    assume by you?

8    A    There actually are coordinates as part of the discovery

9    that you'll get from Mr. Sblendorio's locations.  If you don't

10   have them in front of you, they'll be in the discovery packet.

11   Q    Yeah.  But we don't have that here today, correct?

12   A    I'm not sure what you -- okay, yes, sir.

13   Q    I just want to make sure.

14   A    Yeah.  I don't believe they're on that document.

15   Q    And there's nothing indicating any information that would

16   relate to it other than simply a listing of presumed calls and

17   text messages (indiscernible).

18   A    Well, I wouldn't say presumed.  Those happened.  But the

19   Court (indiscernible).

20   Q    And there's no supporting documentation that's been

21   provided (indiscernible), correct?

22   A    I'm not sure what you have, sir.

23   Q    Well, this is all we have, right?

24   A    Okay.

25   Q    Mr. Sblendorio has no criminal convictions, correct?

1   A    Not to my knowledge, no, sir.

2   Q    None, correct?

3   A    Not to my knowledge, no, sir.

4   Q    Okay.  Are you aware that he has moved to Seattle,
5   Washington for awhile?

6   A    I was not.

7   Q    Okay.  Do you know that he has been gainfully employed
8   over the past several years?

9   A    I know that.

10  Q    Okay.  Now, there was talk about weapons.  Mr. Sblendorio
11  has no prior criminal history and is not disqualified from
12  owning weapons, correct?

13  A    He is not disqualified in terms of it being a felony.  No,
14  sir.

15  Q    Okay.  And there is no -- he's a citizen of the United
16  States at this time and he hasn't been convicted of a felony.
17  And he can vote and he can bear arms and he can have weapons in
18  his home, right?

19  A    Unless he is committing gang activity.  That would be a
20  violation of the Texas Unlawful Carrying of a Weapon as a Gang
21  Member.

22  Q    Okay.  And at this point he has not been convicted of
23  anything, has he?

24  A    Not that I have seen.

25  Q    Okay.  And if we look at your -- at Exhibit 35 --

1    MR. TROIANI:  May I approach, Your Honor?

2    THE COURT:  Yes, you may.

3  BY MR. TROIANI:

4  Q    The weapons are properly stored in a safe, are they not?

5  A    I'm not sure what's --

6  Q    It's a gun safe, right?

7  A    It's a gun safe.  I don't know what's proper.  But he has

8  guns in there, yes, sir.

9  Q    They're not littered around the house where

10  (indiscernible) pick them up or other people could pick them

11  up, correct?

12  A    Yeah, correct.  We did not find any of that in the open.

13  Q    Okay.  Additionally, you had mentioned I believe plastic

14  gloves.  Plastic gloves are used when cleaning weapons,

15  correct?

16  A    I don't use them.

17  Q    People do though, don't they?

18  A    I'm not sure.

19  Q    Okay.  but you've been able to speculate about a lot of

20  other things that people do.  You're not familiar with people

21  using plastic gloves to clean weapons?

22  A    I don't believe I have speculated.

23  Q    You've given a whole lot of background on different things

24  regarding arms, armament, et cetera, and the uses of weapons.

25  But plastic gloves being used to clean them, you are not aware

1  of that?

2  A    I don't use them.

3  Q    You don't use them, but other people may, correct?

4  A    If you say so, sir.

5  Q    Now, there is a margin of error for triangulation of data

6  points for cell towers, correct?

7  A    From my understanding.

8  Q    Okay.  And so triangulation is not precise, correct?

9  A    We'd have to talk to the experts, as you say.

10  Q    And you're not an expert, right?

11  A    I never called myself one, sir.

12  Q    Thank you.  There is -- I don't believe -- and I guess

13  you'll correct me.  Mr. Sblendorio is not a secretary or

14  administrator for the club at this time, correct?

15  A    I can't say that.  He doesn't have the chapter tab on, but

16  many members are starting to remove their rank because they are

17  --

18  A    I'm going to object as to speculation, sir.

19  Q    Does he have -- is he to your knowledge the secretary;

20  that's my question.

21  A    As far as I'm concerned, he is.

22  Q    Okay.  But you're not aware of it and you're not sure?

23  A    He was the last time I saw him.

24  Q    He doesn't have that tab on his cut, which you made a lot

25  of pay on, you know, they're going to have their life story on

1   this cut, right?

2   A     They all don't.  Some of them --

3   Q     So it could be or it could not be, right?  It all depends

4   on the day and on the moment?

5   A     I guess.

6   Q     Other than this charge, Mr. Sblendorio has no other

7   criminal charges, correct?

8   A     In terms of pending?

9   Q     Yes.

10  A     We are still investigating for possible superseding

11  indictment.

12  Q     Okay.  But this is the only open investigation that you're

13  aware of as far as Mr. Sblendorio.

14  A     Other than the domestic violence that happened.  Because

15  we --

16  Q     But no complaint has been made and his girlfriend has not

17  made any complaints --

18  A     She doesn't have to under State of Texas.

19  Q     Well, I understand that.  But no complaint has been made

20  by her at this time, correct?

21  A     Not by her I suppose.  I'm not sure if she talked to HPD

22  or Harris County.  I don't feel comfortable asking -- answering

23  that question.  I don't know if she has or not.

24          THE COURT:  But the point is that there are no

25  pending charges at this time.

1          THE WITNESS:  In terms of a warrant, no.

2          THE COURT:  All right.

3          MR. TROIANI:  Thank you, Your Honor.  I'll pass the

4     witness, Your Honor.

5          THE COURT:  All right.  Mr. Black, any redirect?

6          MR. BLACK:  No, Your Honor.

7          THE COURT:  All right.  Thank you very much, Officer

8     Lyons.  You can step down.

9          THE WITNESS:  Thank you, ma'am.

10          THE COURT:  Okay.  Ms. Raynor, any proffer, other

11     presentation?

12          MS. RAYNOR:  We have a couple proffers.  Present in

13     the courtroom, Your Honor, but I am not calling them to

14     testify, is Diana Lopez, which is Mr. Hinojosa's mother.  She

15     has been a resident of the Houston community for over thirty-

16     something years.  She would proffer that she would be willing

17     to (indiscernible) for her son if the Court were to grant him a

18     bond (indiscernible).

19          THE COURT:  Have they been living -- has Mr. Hinojosa

20     been living with her?

21          MS. RAYNOR:  Correct.  So once he put his house up

22     for sale, he's been living with his mother ever since.

23          She has no criminal history.  She would testify that

24     she has no criminal history and she doesn't own any guns and is

25     willing to adhere to whatever the Court (indiscernible) for

1  being his custodian (indiscernible).  So is his common-law

2  wife/girlfriend, who is present in the courtroom, Ms. Jennifer

3  Hernandez.  She is gainfully employed, living with him as well

4  as his mother and has -- and is -- I think she is seven months

5  pregnant right now.  But she said that she has (indiscernible)

6  she is willing to also (indiscernible).

7            THE COURT:  Mr. Troiani?

8            MR. TROIANI:  Yes, Your Honor.  If I may.

9            THE COURT:  Mm-hmm.

10           MR. TROIANI:  Your Honor, we would proffer that Marge

11 Sblendorio, Mr. Sblendorio's mother, is available to serve as a

12 third-party custodian.  He is not a flight risk.  He has -- he

13 owns his own home.  He had no prior felony conviction.  His

14 family lives in the United States.  His mother and father and

15 brother are all residents of the State of Florida.  He has no

16 connections or family outside of the United States.  He has a

17 passport.  He can return that passport and turn it into U.S.

18 Probation.  He can place his home as a surety for any risk or

19 concern the Court might have as far as flight.

20           He is willing to participate in substance abuse

21 treatment and he is willing to participate in any conditions

22 that the Court may request such as (indiscernible) as far as

23 where his whereabouts might be if that is necessary.

24           But given the fact that he has no prior criminal

25 history, he has no pending charges other than this charge, he

1    has not been convicted of this charge and it's simply a

2    pretrial phase, and bond is the rule rather than the exception

3    according to the Supreme Court of the United States, there are

4    conditions which would allow him to be out on bond and

5    (indiscernible) his defense.  Because if he is incarcerated,

6    access to information, access to (indiscernible) is a little

7    bit more difficult whereas if he is out, he could come to my

8    office, we can communicate, we can look at his home.

9           And I've shown the government some photos.  I don't

10   know if the -- which I will tender to the Court on behalf of my

11   client.  And his girlfriend, Madison, is here present in the

12   courtroom.  And they have been living together.  But if the

13   Court considers that to be a concern or an issue, then we can

14   address that as well.  I am tendering photos of Mr.

15   Sblendorio's home, his family for the Court's review.

16          THE COURT:  All right.  Are these labeled?

17          MR. TROIANI:  They have not been.  We just got them.

18          THE COURT:  I think I'll just call them just

19   Defendant's -- or Sblendorio Exhibit 1.

20          (Sblendorio Exhibit 1 marked for identification)

21          MS. RAYNOR:  But as far as the pretrial services

22   report that was submitted, his mother was available to confirm

23   the information.  I did make contact with (indiscernible)

24   yesterday, gave her the phone number for his mother to confirm

25   that information.  And his girlfriend, Madison, is in the

1  courtroom and she can confirm that information as well.  And

2  both of them are willing to accept him into the home.  And he

3  in fact owns his home, which the Court is aware which can be

4  placed as security for a loan.  Thank you, Your Honor.

5          THE COURT:  All right.  All right.  Let's proceed to

6  argument.

7          MR. BLACK:  Your Honor?

8          THE COURT:  Yes.  Mr. Black?

9          MR. BLACK:  Your Honor, the Government is requesting

10  detention in both of these cases for both of these defendants

11  rather.

12          I'll start with Mr. Hinojosa.  Actually this applies

13  to both, but there is a rebuttable presumption in this case and

14  that is by virtue of the (indiscernible) use of a firearm in

15  furtherance charge here.  And so bond in this unique set of

16  cases is not the rule because there is that presumption.  I

17  know the Court is aware of that.  I won't belabor that fact.

18          The Government is concerned with both of these

19  defendants, including Mr. Hinojosa is fold, although primarily

20  public safety concern.  There's always some inherent flight

21  risk concern when someone is facing a significant penalty such

22  as a mandatory minimum.  So I won't downplay that, but I'm

23  going to spend most of my time talking about public safety.

24          So the public safety concern I think is probably

25  self-evident from the agent's testimony and the allegations in

1    the indictments.  With respect to Mr. Hinojosa, there is some

2    indication at least he was involved in the shooting back in

3    2021 and then a very similar circumstance in which he is not

4    charged in 2023 against rival gang members.  While he

5    admittedly is not the trigger puller, he is in probably almost

6    a more concerning position of acting as sergeant at arms in an

7    organization coordinating and orchestrating this violence.

8    That I think speaks to the danger he poses to the community.

9    He doesn't need to himself be committing violence, he can

10   simply be somewhere else coordinating violent activities by the

11   enterprise and others will enact it on his (indiscernible)

12   behalf.

13          Additionally, I know the Court heard about the drug

14   trafficking activity by the Defendant.  There is always some

15   inherent danger associated with drug trafficking that I know

16   the Court is aware of.

17          And then of course the Defendant's association with

18   an enterprise that engages in criminal activity.

19          Now, I'll concede that not every Bandido

20   (indiscernible).  There probably are some out there that don't.

21   But here we're talking about these two Bandidos and others that

22   the Court heard evidence on.  And there is I think a real

23   concern about the danger they pose in the community.

24          Other things to note about Mr. Hinojosa.  The

25   Government does not believe that his mother would be an

1    appropriate custodian.  That is the residence that agents

2    searched and found the cocaine paraphernalia, drug packaging

3    and so on, ammunition.  So I don't think that that would be an

4    appropriate home plan for him even if the Court were inclined

5    to grant bond.

6            The Defendant has a limited employment history.  I

7    don't know if he's currently employed, but the testimony had

8    been for one month.  That's a little bit of a concern from a

9    flight risk standpoint.  And so I would highlight that for the

10   Court.

11           Finally, he is on bond currently for his two state

12   cases.  I would note that the possession of ammunition and

13   cocaine in his residence along with his admission to using

14   cocaine recently all constitute violations of that bond.  So he

15   has shown already that he is not abiding by the conditions of

16   the Court previously.

17           Turning to Mr. Sblendorio, the Government's concern

18   is with respect to the same.  We're talking about public safety

19   concerns here primarily.  With Mr. Sblendorio, he is directly

20   involved -- not as a trigger-puller, again, but he is the

21   driver in the shooting and attempted murder of a rival gang

22   member.  That carries with it obvious public safety concerns

23   that he was directly involved in that activity.

24           A search of the Defendant's house yielded cocaine and

25   multiple firearms, which is concerning given the allegations of

1   violence in this case.  And then additionally more troubling

2   still I think is the very recent allegation of domestic

3   violence in this case with someone the Defendant was living

4   with.

5           All of that I think shows that the Defendant does

6   pose a very real risk to public safety, one that cannot be

7   addressed by court order or conditions given the extremity of

8   the criminal activity being attempted murder.

9           The Defendant also has it looks like some drug use.

10  He admits some recent drug use, which is always of some

11  concern.  And then to the flight risk concern, although not as

12  pronounced in this case, he does have a passport and has done a

13  lot of international travel, which is (indiscernible).

14          So all of this to say the Government does not believe

15  they are conditions that this court consent (indiscernible)

16  primarily assure the community safety and that they should be

17  detained (indiscernible).

18          THE COURT:  Thank you.  All right.  Ms. Raynor?

19          MS. RAYNOR:  Your Honor, (indiscernible) Mr. Hinojosa

20  has (indiscernible).  He -- even though he has two open cases

21  in court -- one in (indiscernible) County and one in Harris

22  County.  He's been out on bond.  The conditions have been set

23  for him and he's been compliant with those particular

24  conditions.

25          THE COURT:  No, he hasn't.  Not with the possession

1    of drugs, possession of ammunition, if that were found in his
2    home.

3            MS. RAYNOR:  They were not found in his room; they
4    were found in his home.

5            MR. BLACK:  And I guess I can clarify the record.
6    The drug packaging was not found in his room.  The cocaine was
7    found in his room.

8            THE COURT:  Okay.

9            MS. RAYNOR:  And whatever exhibit that was, Your
10   Honor, it was a small, partially used cocaine as I reflect back
11   on it.  It was a very small plastic bag.

12           THE COURT:  But that is also a violation of bond.

13           MS. RAYNOR:  It may very well be.  And that's a
14   condition that the Court could (indiscernible) say that he
15   probably needs some drug treatment and needs to be put in drug
16   rehab rather than, you know, being a flight risk or a danger to
17   society.  We're talking about him being a danger to society and
18   whether he's a flight risk.

19           THE COURT:  Right.

20           MS. RAYNOR:  He has surrendered his passport to
21   (indiscernible) County so he can't flee the country.  He's been
22   gainfully employed.  He has not one job, but two jobs.  And he
23   has children, ages 13, 14, and 8 (indiscernible) gives him the
24   incentive to just stay around and try to do right.

25           He has evidenced that the prosecution has provided

1    are the cell phone records. (indiscernible) the content of

2    those cell phone records are with respect to his offer to the

3    two individuals who (indiscernible) on June the 3rd, 2023. So

4    we don't think that the evidence is that strong as it believes

5    that it is with respect to the (indiscernible). So has no

6    incentive to continue to create any criminal activity while

7    he's out on bond.

8            I think the Court could consider a monitoring of him

9    or placing him in some drug treatment, residential drug

10   treatment for -- during the time to cure anything that the

11   Court has a concern with, with respect to him using drugs.

12           We addressed the bond issue, right? We addressed the

13   flight issue.

14           So I don't think he has any guns that are -- that

15   were found in his home. There was ammunition, but there was no

16   firearms that were found in his room.

17           And I think that the Court could set, again, some

18   conditions that he could abide by and assure that his presence

19   -- you know, he could come back to court and show up like he's

20   been doing for the last seven, eight months in state court,

21   Your Honor.

22           THE COURT: All right. Thank you. Mr. Troiani?

23           MR. TROIANI: Thank you, Your Honor. Again, Your

24   Honor, Mr. Sblendorio is not a flight risk. He can turn in his

25   passport. He has family connections to the United States --

1    THE COURT: I'm going to just cut you short. I agree

2  with you. This is not a flight risk issue.

3    MR. TROIANI: The next issue is as far as the danger

4  to community. He has no conviction for any offenses whatsoever

5  on his criminal history. He is charged in this offense. He

6  has not been convicted at this point. There is a lot of

7  speculation. There is a lot of this is what happens here. But

8  as to his participation, that is not what we're hearing. His

9  weapons that he had at the house the government has taken. If

10  there are weapons at the house, they can be removed. I know

11  the Government took some pistols from the house. It's not

12  illegal to own pistols. It's not illegal to have the

13  equipment. Nothing that was at the house was illegal other

14  than the government did find some white powdery substance, a

15  small amount which has not been tested yet. My client did

16  admit that he has used drugs. But that can be handled very

17  quickly with -- through pretrial services, through drug

18  treatment, even in-house. But I don't think it raises to that

19  level. And pretrial can evaluate that.

20    And as far as his girlfriend and the allegations, I

21  was unaware of that until this morning. And she has not made

22  any claim. If the Court would prefer that she not be at the

23  house, he is the homeowner. And if it is an issue and if it

24  develops into an issue, that is something that can be

25  addressed.

1          He has been a law-abiding citizen as far as

2    employment and everything else as far as the Court is concerned

3    for his entire life.  He has no criminal convictions.  We have

4    an allegation at this point.  He wants to fight that

5    allegation.  I have been appointed to do that.  And he can

6    assist me better out than he can incarcerated and unable to

7    access documents, et cetera, that would be available for his

8    defense.

9          And for those reasons, Your Honor, we are asking that

10   the Court set a reasonable bond given the circumstances, and he

11   has the ability to pay that bond or to provide collateral as

12   needed by the Court under these circumstances.  And we'll leave

13   the bond amount up to the Court.  But this is a situation where

14   this gentleman has that ability and he can follow the rules

15   because everything indicates that he has followed the rules as

16   far as employment, paying of taxes, owning his own home, et

17   cetera.  And these things are not and have not been alleged to

18   be the fruits of some sort of criminal activity such as a drug

19   dealer or some other type of case that we regularly see in this

20   type of proceeding.

21         And according to the membership card, he is a recent

22   member, 2023.  He may have had associations before, but none of

23   these things indicate that he cannot follow the rules while on

24   bond.

25         THE COURT:  All right.  Thank you.

1          MR. TROIANI:  Thank you.

2          MS. RAYNOR:  Your Honor, I'm sorry.  I left out

3   something very, very important.  If the Court would give me an

4   opportunity to address it.

5          THE COURT:  Mm-hmm.

6          MS. RAYNOR:  The small package with white powder in

7   it that was found in Mr. Hinojosa's room is not in fact

8   cocaine.  It's lidocaine is what it is.  It's a prescribed

9   painkiller.  And, I mean, if you test it to ensure that it's

10  not an illegal drug, that would be --

11         THE COURT:  I'm not -- we're not getting into that at

12  this point.  I mean, we had the officer testify that it is in

13  fact cocaine.  I mean, this didn't come up before.

14         MS. RAYNOR:  I don't remember -- is that what he

15  testified?

16         THE COURT:  He did.  He testified that it was

17  cocaine.  Yes.

18         MS. RAYNOR:  Okay.

19         THE COURT:  All right?  Okay.  All right.

20         In this case, the Government has sought to detain

21  each of you based on the nature of the charges in this case

22  which involve crimes of violence.  And under the Bail Reform

23  Act, there is a presumption that you all should be released

24  unless I find that there is no condition or combination of

25  conditions that would reasonably assure that your release would

1    not impose an unacceptable risk of danger to the community or

2    would pose a risk of non-appearance in this case.  And because

3    of the nature of the charges, which are incredibly serious,

4    including attempted murder, there is a presumption that each of

5    you should be detained.

6              And I find based on the evidence here that you have

7    not rebutted the presumption that your release would pose an

8    unacceptable risk of danger to the community.  And even if you

9    had rebutted the presumption, there is clear and convincing

10   evidence that your release would pose an unacceptable danger.

11             The weight of the evidence as to each of you is very

12   strong.  With respect to Mr. Hinojosa not only has the

13   Government presented evidence showing that you are connected

14   with a shooting back in November 2nd of 2021, but also were

15   essentially the coordinator and shot-caller for the attempted

16   murder on June 3rd, 2023, which underlies the current federal

17   charges.

18             And in addition, the Government also presented

19   evidence showing that Mr. Hinojosa is involved in trafficking

20   of narcotics, which underscores the danger that his release

21   would pose to the community.  And also that despite being

22   released on conditions by the state court, Mr. Hinojosa did not

23   comply with those conditions because he continued to possess

24   narcotics even while on release.  So I have no confidence that

25   any conditions would be sufficient to ensure that he would not

1    pose a danger to the community.

2          As to Mr. Sblendorio, the lack of prior criminal

3    history is not sufficient to outweigh the significance and the

4    danger evidenced by the underlying offense that led to these

5    charges, namely his driving -- his coordination with others

6    including with Mr. Hinojosa to attempt to murder a rival gang

7    member on the streets of Houston.

8          I find the weight of the evidence is strong,

9    including the detailed testimony of the investigating officer

10   regarding locations and the multiple communications leading up

11   to and after the shooting on the evening of its occurrence.

12         Also I take into account that Mr. Sblendorio attacked

13   and assaulted his own girlfriend and that a neighbor intervened

14   to protect her.  And regardless of whether any charges were

15   filed, this just underscores that he has committed acts of

16   violence that endanger the community.  And there are no

17   conditions that I find satisfactory to offset those conditions

18   or those concerns.

19         I understand Mr. Troiani's position that his release,

20   his client's release would facilitate the preparation of

21   defense, but that's just not a factor in determining whether

22   someone's release would pose an unacceptable danger.

23         So for those reasons and others I will detail in my

24   written order, each of you will be detained until trial.

25         MR. TROIANI:  Your Honor, if I may just very quickly?

1          THE COURT:  Yes.

2          MR. TROIANI:  Would the Court entertain house arrest

3   with (indiscernible)?

4          THE COURT:  No.

5          MR. TROIANI:  Yes, Your Honor.

6          THE COURT:  No, thank you.  All right.  Yes, so we

7   need to proceed to arraignment for each of the defendants.

8          All right, we are proceeding to arraignment.  This is

9   the part of your case where you will be entering a formal plea

10  to the charges against you.

11         Let me start with Mr. Hinojosa.  Have you received a

12  written copy of the indictment?

13         MR. HINOJOSA:  Yes.

14         THE COURT:  Okay.  And Ms. Raynor or Mr. Troiani,

15  have your clients waived formal reading of the charges?

16         MR. TROIANI:  We do, Your Honor.

17         THE COURT:  All right.  Mr. Hinojosa, have you

18  discussed the charges in this case with your attorney?

19         MR. HINOJOSA:  Yes.

20         THE COURT:  And do you understand the charges against

21  you?

22         MR. HINOJOSA:  Yes.

23         THE COURT:  Are you ready to enter a plea at this

24  time?

25         MR. HINOJOSA:  Yes.

1          THE COURT:  How do you plead?

2          MR. HINOJOSA:  Not guilty.

3          THE COURT:  I am entering a not guilty plea on your

4     behalf in this case.

5          All right.  Mr. Sblendorio, did you receive a written

6     copy of the indictment?

7          MR. SBLENDORIO:  Yes.

8          THE COURT:  have you discussed the charges with your

9     attorney?

10          MR. SBLENDORIO:  Yes.

11          THE COURT:  Are you ready to enter a plea at this

12     time?

13          MR. SBLENDORIO:  Yes.

14          THE COURT:  All right.  How do you plead, guilty or

15     not guilty?

16          MR. SBLENDORIO:  Not guilty.

17          THE COURT:  I am entering a not guilty plea on your

18     behalf as well.

19          Your case is assigned to Judge Keith Ellison.  And

20     here is a schedule for the case.  Motions are due November 8th.

21     Responses due November 15th.  The proposed jury questions and

22     jury charge are due December 6th.  The pretrial conference will

23     be on December 6th at 10:30 a.m. and jury selection and trial

24     will begin December 16th at 9:00 a.m.

25          Mr. Black, now may days do you estimate for the

1    trial?

2              MR. BLACK:  Seven days, Your Honor.

3              THE COURT:  Let me write this down.  And Ms. Raynor,

4    does the client waive speedy trial at this time?

5              MS. RAYNOR:  Yes, Your Honor.

6              THE COURT:  And how about your client, Mr. Troiani?

7              MR. TROIANI:  Your Honor, we are going to refrain

8    from that at this moment.

9              THE COURT:  Sure.  No problem.  Okay.  Anything else

10   we can do to --

11        (Hearing adjourned at 11:04 AM)

12                          * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, court-approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8    *Sonya M. Ledanski Hyde*

9

10   Sonya Ledanski Hyde

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  December 27, 2024